SEYBOLD, Appellant, v. BURKE and others, Respondents.

*September 8—October 3, 1961.*

398

For the appellant there was a brief by *O'Melia & Kaye* of Rhinelander, and oral argument by *Walter F. Kaye.*

For the respondent Beatrice Burke there was a brief and oral argument by *Forest W. Rodd* of Rhinelander.

For the respondents Stuart there was a brief by *Everis H. Reid* of Hurley, attorney, and *Wright & Zinn* of Ironwood, Michigan, of counsel, and oral argument by *Ivan D. Wright.*

FAIRCHILD, J. 1. *The boundary described by the deeds.* The circuit court found that the true common boundary between the Burke and Seybold lands is a line parallel to the quarter line as shown in the survey of F. R. Wincentsen, and that the quarter line bears south 1°, 55′ east from the accepted center quarter corner of section 14. A map of the Wincentsen survey was attached to the judgment.

A government resurvey was made in 1929, presumably because several lakes were inaccurately meandered in the original survey. The certified copies of the original government survey, among the records of the register of deeds were received by reference, but not included in the record on appeal. No map of the 1929 resurvey appears to have been introduced. The surveyors who testified assumed that a particular point was the quarter corner at the center of section 14. There was no testimony as to how its location had been determined, and all the parties to the action apparently accepted it as correct. Upon the record made in this action, it is proper to presume that the point accepted as the center is at the intersection of the north-south quarter line (connecting the mid-point of the north line of the section with the mid-point of the south line), and the east-west quarter line (connecting the mid-point of the west line of the section with the mid-point of the east line).[1]

---

[1] 43 USCA, Public Lands, p. 63, sec. 752, provides in part:

"The boundaries and contents of the several sections, half sections, and quarter sections of the public lands shall be ascertained in conformity with the following principles:

"First. All the corners marked in the surveys, returned by the field surveying service, shall be established as the proper corners of sections, or subdivisions of sections, which they were intended to designate; *and the corners of half and quarter sections, not marked on the surveys, shall be placed as nearly as possible equidistant from two corners which stand on the same line . . .*" (Emphasis supplied.)

See also sec. 59.62, Wis. Stats., requiring that a surveyor subdividing a section established by a United States survey shall proceed according to the statutes of the United States.

Wincentsen, the county surveyor, testified that he made a survey in 1948 for the owner of other land. He located a point on the ice of a lake which he treated as the quarter corner on the south line of section 14. He ran a line from that point to the assumed center quarter corner. He determined that this line had a bearing of south 1°, 55′ east (mean magnetic bearing adjusted for declination). He apparently determined the quarter corner on the lake by doubling the distance from the southwest government corner (which he found) to the one-eighth corner determined by another surveyor. He also found the southeast government corner of the section and measured the distance from the southwest to the southeast corners. He found that the point he treated as the quarter corner was eight feet west of the exact mid-point of the south line, but the resulting error in the quarter line, swinging it a little to the west, was favorable to Seybold.

Assuming as we do for the purpose of this action that the point he assumed as the center quarter corner was on the north-south quarter line, the line he ran from the center point to the mid-point of the south line of the section was sufficiently shown to be the quarter line referred to in the Doriot deeds.

Of course the 1929 resurvey occurred after the Doriot deeds, but there is no evidence that it located the section corners at different points from those in the original government survey. It was the duty of the government surveyors in 1929 to re-establish the original corners.[2] It must be presumed in the absence of evidence to the contrary that the surveyors performed their duty.[3]

---

[2] *Fellows v. Willett* (1923), 98 Okla. 248, 224 Pac. 298; 6 Thompson, Real Property (perm. ed.), p. 590, sec. 3383.

[3] *Chandler v. Munkwitz Realty & Investment Co.* (1912), 148 Wis. 5, 134 N. W. 148; *State ex rel. Lawrence v. Burke* (1948), 253 Wis. 240, 33 N. W. (2d) 242; 9 Wigmore, Evidence (3d ed.), p. 488, sec. 2534.

One of Mr. Seybold's witnesses, Surveyor Kowalke, was called to testify as to the location of Mr. Seybold's fence in 1955. He had been in the area while making a survey for an owner of land west of the quarter line. He testified on cross-examination that he had found the southwest and southeast government corners of section 14, located the mid-point of the south line on the ice, and run a line from the mid-point to the assumed center of the section. The bearing of this line was south 1°, 7′ east. Wincentsen explained that the 48′ difference between the bearing as determined by Kowalke and the one determined by himself might have been due to Kowalke's having taken a solar observation to determine true north.

Plaintiff Seybold produced no evidence to support his claim as to the proper bearing of the north-south quarter line except as might be inferred from a certificate made in 1919 by D. H. Vaughan, county surveyor. In it he stated' that in 1916 at the request of Doriot he made a survey of the description conveyed to the Seybolds. The location of a blazed tree and stake was testified to, apparently with the supposition that they were on the quarter line as determined by Vaughan although there is no reference to them in the certificate. Seybold testified that he set monuments where Vaughan set stakes showing the west boundary of the Seybold land. Vaughan's certificate may be competent evidence under sec. 59.64, Stats. It, however, shows no bearings for the quarter line, nor does it refer to any monuments from which he may have worked other than the center of section 14.

The court's determination that the Wincentsen survey correctly shows the quarter line is amply supported, and it is conceded that the Burke-Seybold common boundary is parallel to it. No claim is made that the east boundary of the Burke land, as conveyed in 1918, is different from the west

line of the Seybold land as conveyed in 1915, although the length of the line in the two descriptions differs. In the Seybold deed, its length is given as 950 feet, and in the Burke deed as 1,130 feet.

2. *Acquiescence.* Mr. Seybold testified that in 1917 he placed the concrete monuments at each end of the boundary to which he now claims, bearing south 5° west, and that in the same year he built a fence along the claimed boundary. Mrs. Burke denied the existence of the fence, admitted seeing the monument near the lake, but thought its location had been changed. Other evidence as to the fence will be mentioned in connection with the claim of adverse possession. Seybold contends that the boundary was established by Mrs. Burke's acquiescence in the boundary he marked, whether or not the fence existed for as long as twenty years. He cites *Nagel v. Philipsen.*[4]

The court concluded there was no evidence that Mrs. Burke ever saw the fence. Assuming that the existence of the fence and the significance of the monument near the lake were known to Mrs. Burke, acquiescence in such boundary would, as decided in *Nagel v. Philipsen, supra,* make out a *prima facie* case that the Seybold fence was on the correct boundary. The *prima facie* showing would, however, be overcome by the proof previously discussed, that the boundary referred to in the Doriot deeds was a different line.

The other situations pointed out in *Nagel v. Philipsen, supra,* where an owner may be bound by acquiescence in a marked boundary are not in this case, *i.e.,* a fence erected on an agreed boundary after a dispute and acquiesced in by the adjoining owners for a long time thereafter; a fence or stakes erected by a common owner who then sells the adjoining parcels with the representation that the marked boundary is the true one; estoppel of an adjoining owner

---

[4] (1958), 4 Wis. (2d) 104, 90 N. W. (2d) 151.

who causes a third party to believe that the fence marks the boundary, and in reliance thereon the third party purchases the land of the other adjoining owner.

3. *Adverse possession for twenty years.* The circuit court having determined the boundary described in the Doriot deeds upon sufficient evidence, the burden was upon Seybold to prove adverse possession of the disputed area for more than twenty years.

There was testimony that on occasion he had cut the brush east of the fence line. There was other testimony that no difference in the brush was apparent where he claimed to have cut. The circuit court indicated orally that it was satisfied that the situation was not maintained sufficiently over a period of years to give anyone notice of an adverse claim. Cutting of brush was the only activity Seybold claimed to have carried on in the disputed area. His improvements other than the fence were farther east.

In spite of the suggestion of Mrs. Burke to the contrary, it would appear from the record that the concrete monuments had been in place for a great many years, perhaps since 1917. They were, however, more than 900 feet apart, and because of the character of the ground, unimproved and brush-covered, we do not view the existence of the concrete monuments as sufficient notice of a claim nor evidence of occupancy up to the line running between them.

At the time of trial in 1960, a fence ran between the concrete monuments along the boundary claimed by Seybold. It consisted of a single strand of wire strung on posts, some metal and some wood. It is clear that this wire was strung recently, perhaps in 1959.

Mr. Seybold testified that he had put up a fence consisting of cedar posts and three strands of wire along the same line in 1917. He conceded that it fell into disrepair a number of years ago, although he claimed the wire was on the ground and some of the posts remained.

It appears that an old road, still discernible, crossed the Burke land about 200 feet north of the lake shore and crossed the Seybold land. Years ago Seybold used this road to reach his cabin and permitted the people who bought the eastern portion of his land to use it. Mr. Bey, a son-in-law of the latter couple, testified that he lived on their place from 1930 to 1937 and used the old road from 1930 until permission was withdrawn by Seybold. He thought Seybold closed the road in 1932 or 1933, Seybold about 1935. Bey testified that there was a fence at that time between the two concrete markers, and that it was necessary for him to use a gate. He said the fence was not new in 1930, and he had looked at some of the old posts and postholes along the line shortly before the trial.

In 1948 when Wincentsen made his survey, he examined the territory between the concrete monuments but observed no fence.

Mr. Kubant, who is a prospective purchaser of the Seybold property, testified there was a fence along the line in 1949, although he did not describe its condition as of that year.

In 1955 when Kowalke made his survey, he saw the fence running from the monument at the north end of the boundary and followed it. He testified that it went only part way to the concrete monument near the lake.

Kirby, Fawley, and Westbrook made a survey in 1958 of the line as claimed by Burke, and saw no fence.

Mr. Laffin lived nearby and for ten years prior to the trial had picked berries in the area where the single-strand fence is now located. He had been over the area 15 or 20 times during the ten-year period and testified that there was no fence there until he first saw the single strand in the fall of 1959.

Mrs. Burke testified that she had been on her property two or three times every year since 1920; that she had not

seen a fence on it until 1959; that when they used to walk to Seybolds along the old road, there was no fence across it.

The court evidently believed that Mrs. Burke was mistaken as to the extent of her observations in the earlier years. The court found that at least a partial fence had existed at some time, but the court was not satisfied the fence ran the entire distance or constituted a substantial inclosure for a period of twenty years. Mr. Seybold had the burden of proof on this issue. The evidence is somewhat vague and indefinite, and we do not consider it sufficient to compel the court to find in Seybold's favor.

4. *Rulings and comments of the court.* Mr. Seybold requests a new trial because of adverse rulings and comments made by the court. We have considered those to which he has referred us, and find no error or abuse of discretion which appears prejudicial. We see no reason to order a new trial in the exercise of our discretionary power.

*By the Court.*—Judgment affirmed.