ANTHONY S. EARL., Secretary Department of Natural Resources
You ask how an E-W 1/4 line and the center 1/4 corner are determined when the E 1/4 corner falls in a meandered lake.
Your request has required several telephone and personal conferences to delineate the questions involved. Section 36, T39N, *Page 262 
R10E, Oneida County (hereinafter referred to as section 36), gives rise to the questions submitted. The DNR owns both the SW 1/4 of the NW 1/4 and the SW 1/4 of section 36 and wishes to survey and monument the parcels properly. Such a survey will require placing or replacing the center 1/4 corner.
Introduction
Sections 59.62, 59.635(8) and 60.38, Stats., require that resurveys of the public lands follow the rules established by the federal government. These rules are contained in the Manual ofInstructions for the Survey of the Public lands of the UnitedStates 1973, published by the Department of the Interior, Bureau of Land Management (hereinafter referred to as the Manual).
Corners established in the survey of the public lands were town, section, 1/4 section and meander corners. Manual, ch. 5:4. You state that dependent resurveys have reestablished all the original corners of section 36, T39N, R10E, Oneida County pursuant to the Manual. See Manual, ch. 6:4, 25-32.
The subdivision of the section interiors was left to the local or county surveyor. Federal rules, however, govern the subdivision of section interiors. Manual, ch. 3:47-76 sec. 59.62, Stats.
Section 36 herein is considered a fractional section. That is, Range Line Lake occupies a portion of the section. Beds of lakes were not part of the public land system and were not subject to disposal by the United States. Sovereignty over lake beds lies with the states. Manual, ch. 1:12. Illinois Steel Co. v. Bilotand wife, 109 Wis. 418, 426, 84 N.W. 855 (1901). Range Line Lake was meandered by the original surveyors and lies astride the E section line of section 36 (also a town line). Range Line Lake covers about 125 acres.
As required, the original surveyors established meander corners on the North and South edges of Range Line Lake where the E section line intersected the edges of the lakeshore. These meander corners have been reestablished in section 36. The E 1/4 corner never was established by the original surveyors because it fell in the lake bed of Range Line Lake. Since the existence of all four 1/4 corners of a section is the key to the subdivision of a section, missing 1/4 corners, like the E 1/4 corner in sec. 36 herein, provide and have provided problems for surveyors. Solutions vary somewhat. Stated in a better way, the rules are fairly clear but applying them in the field *Page 263 
sometimes is difficult. These difficulties pale, however, when compared to those endured by some of the first surveyors. Surveyor Harry A. Wiltse reported an original public land survey in Wisconsin in the year 1847 as follows:
 "The aggregate amount of swamp traversed by the two lines was about one hundred and seventy-five miles, a considerable portion of which might be termed windfall. (Fallen trees, etc.)
 "During four consecutive weeks there was not a dry garment in the party, day or night.
 "Consider a situation like the above, connected with the dreadful swamps through which we waded, and the great extent of windfalls over which we clumb and clambered; the deep and rapid creeks and rivers that we crossed, all at the highest stage of water; that we were constantly surrounded and as constantly excoriated by swarms or rather clouds of mosquitoes, and still more troublesome insects; and consider further that we were all the while confined to a line, and consequently had no choice of ground . . . and you can form some idea of our suffering condition.
 "Our principal suffering, however, grew out of exhaustion of our provisions, coarse as they were . . . . Worn out by fatigue and hardship, and nearly destitute of clothes. they had now to make a forced march of three days for the lake in search of provisions, of which, during that three days, they had had not a mouthful.
 "I contracted to execute this work at ten dollars per mile . . . but would not again, after a lifetime or experience in the field, and a great fondness for camp life, enter upon the same, or a similar survey, at any price whatever." Reports to U.S. General Land Office as reprinted in Public Land Surveys, Lowell O. Stewart, p. 84.
 Jurisdictions
You state that surveyors are concerned because they "must conduct their surveys in such a manner so as to protect their client's property rights as well as their own reputations as professionals." For the purposes of this opinion, the duties of the surveyor are as follows: The surveyor examines all the evidence available to locate or relocate lines and corners and interprets such evidence to form a professional *Page 264 
opinion concerning locations of such lines and corners. The convincing power of his opinion descends on many factors, some of which are as follows: skill in the use of instruments; training and experience; knowledge of legal presumptions and rules; knowledge of possible sources of information; detective, research and interpretative abilities; and patience. In his resurvey, the surveyor also must note disparities between possession and title lines and corners. In Beduhn v. Kolar, 56 Wis.2d 471, 476,202 N.W.2d 272 (1972), the court stated:
 "A survey of a description does not determine title to land but seeks to find and identify the land embraced within the description . . . ."
The courts hold the authority to declare property rights. That is, the courts ultimately declare, based on evidence presented, the location of lines and corners and whether possession or title lines and corners control in particular boundary disputes. SeeManual, ch. 6:11-18.
State courts hold final authority over land within their boundaries which is privately owned, state owned and federally owned now, but once privately owned. The best example of the latter ownership in Wisconsin is federal forest lands like the Nicolet and Chequamegon National Forests. Federal courts hold final authority over boundary disputes between the states, control of navigation, and submerged lands beyond the 3-mile limit. The Wisconsin Supreme Court is the final authority for questions presented in this opinion. C. Brown, Boundary Controland Legal Principles (2nd ed. 1969), pp. 197-198.
Meander Corners and Lines
The significance of a meander line is stated in the Manual, ch. 3:115, as follows:
 ". . . The general rule is that meander lines are run not as boundaries, but to define the sinuosities of the banks of the stream or other body of water, and as a means of ascertaining the quantity of land embraced in the survey; the stream, or other body of water, and not the meander line as actually run on the ground, is the boundary. . . ." *Page 265 
In accord, Wisconsin Realty Co. v. Lull, 177 Wis. 53, 59,187 N.W. 978 (1922); Wright v. Day and another, 33 Wis. 260, 263-264
(1873).
Meander corners established by the original surveyors marked the direction of section or town lines to a meandered body of water. That is, the meander post itself usually was set a certain distance back from the water's edge. See Wright v. Day, supra. The setback minimized destruction of the meander post by high water, waves and ice. Setback of meander posts is required by federal rule. Manual, ch. 3:117.
The true property corner is the ordinary high watermark, not the meander corner. See, Mayer v. Grueber, 29 Wis.2d 168,173-175, 138 N.W.2d 197 (1965); Diana Shooting Club v. Hustings,156 Wis. 261, 272, 145 N.W. 816 (1914). The meander corner only controls the direction of a line to its intersection with the water and such intersection is the property corner. The meander corner is not used as a measuring point. In Underwood and anotherv. Smith and another, 109 Wis. 334, 340, 85 N.W. 384 (1901), the court stated:
 ". . . the meander post is not a corner nor the meander line a boundary. The lake . . . is the boundary, and not the meander line or meander post. . . ."
In Thunder Lake L. Co. v. Carpenter, 184 Wis. 580, 583,200 N.W. 302 (1924), the court stated:
 ". . . The so-called meander corner is not a fixed point for measurements, as are established section corners and quarter corners, but is a marker for courses. . . ." (Emphasis supplied.)
(Note: Meander corners and lines sometimes become property corners and lines in fraudulent surveys. Manual, ch. 7:77-93;Kind v. Vilas County, 56 Wis.2d 269, 201 N.W.2d 881 (1972);Schultz v. Winther, 10 Wis.2d 1, 101 N.W.2d 631 (1960);Lakelands, Inc. v. Chippewa Flambeau Imp. Co., 237 Wis. 326,295 N.W. 919 (1941); Brothertown Realty Corporation v. Reedal,200 Wis. 465, 227 N.W. 390 (1930); sec. 30.10(4)(b), Stats.)
Surveying Section 1/4 Lines and the Center 1/4 Corner.
 Section 59.62, Stats., provides in part as follows: *Page 266 
 "Subdividing sections. Whenever a surveyor is required to subdivide a section or smaller subdivision of land established by the United States survey he shall proceed according to the statutes of the United States and the rules and regulations made by the secretary of the interior in conformity thereto. . . ."
When opposite 1/4 corners have been found or reestablished, a line is run between such opposite 1/4 corners to establish the 1/4 line. Manual, ch. 3:77. When opposite 1/4 corners cannot be fixed, 1/4 lines are run in a cardinal direction or more often on a mean bearing of the corresponding section lines. The Manual, ch. 3:88, provides as follows:
 "The law provides that where opposite corresponding quarter-section corners have not been or cannot be fixed, the subdivision-of-section lines shall be ascertained by running from the established corners north, south, east, or west, as the case may be, to the water course, reservation line, or other boundary of such fractional section, as represented upon the official plat.
 "In this the law presumes that the section lines are due north and south, or east and west lines, but usually this is not the case. Hence, in order to carry out the spirit of the law, it will be necessary in running the center lines through fractional sections to adopt mean courses where the section lines are not on due cardinal, or to run parallel to the east, south, west, or north boundary of the section, as conditions may require, where there is no opposite section line."
The intersection of the 1/4 lines run establishes the center 1/4 corner and it becomes "the corner common to the several quarter sections, or the legal center of the section." Manual, ch. 3:87.
 Survey of Section 36, T39N, R10E, Oneida County, if previously not subdivided.
The original plat and field notes must be consulted on a survey like that herein. The Bureau of Land Management pamphletRestoration of Lost or Obliterated Corners and Subdivision ofSections, a Guide for Surveyors 1973 provides that original town, section and 1/4 corners must stand as the true corners which they represent whether or not they are in the places shown by the field notes. Further, a grant of the public lands includes the official plat and field notes. In Cragin v. Powell,128 U.S. 691, 696 (1888) the Court stated: *Page 267 
 ". . . It is a well settled principle that when lands are granted according to an official plat of the survey of such lands, the plat itself, with all its notes, lines, descriptions and landmarks, becomes as much a part of the grant or deed by which they are conveyed, and controls so far as limits are concerned, as if such descriptive features were written out upon the face of the deed or the grant itself."
Copies of the original plat and field notes may be obtained from the Commissioners of Public Lands, State of Wisconsin, Madison, Wisconsin .
Town lines which form the E and S lines of section 36 herein were surveyed by H. C. Fellows in July, 1859. The W and N section lines were surveyed by William E. Daugherty in October of 1863. The plat and the field notes from which the plat was prepared indicate that the section was surveyed properly.
Daugherty's survey of the N section line is subject to suspicion, however. His field notes indicate that he ran a random line east 79.80 chains from the NW section corner (Variation 5° E) to "Intersect Range line 21 links South of Post," or 21 links south of the post marking the NE corner of section 36 set by Fellows in 1859. Daugherty's notes then show that he returned westward setting the N 1/4 post at 39.90 chains, or the midpoint of the N section line.
Resurvey of the N section line has established two lines of markedly different bearings, rather than one straight line as indicated on the original plat. Resurvey has established a bearing of S 87° 58' E for the line between the NW section corner and the N 1/4 corner, and a bearing of S 65° 17' E for the line from the N 1/4 corner to the NE section corner.
If Daugherty actually had run the random line east to intersect the range line in the direction he recorded, the random line would have fallen about 8 chains north of the NE section corner rather than 21 links south thereof as reported in his field notes. The excess or falling allowed for such lines in 1863 was 50 links. The disparity between Daugherty's notes and resurvey findings indicate that Daugherty probably only ran the N section line from the NW section corner to the N 1/4 corner and never actually ran the random line east to the NE corner, then returning to set the N 1/4 corner. *Page 268 
Resurveys by local surveyors over the years have revealed this pattern of "shortcutting" employed by Daugherty. In many surveys in the area, Daugherty ran northward on a meridional line and only extended lines east and west from the section corners one-half mile, setting 1/4 corners. He made up notes for the survey of last 1/2 mile in his field book. Since contract surveyors like Daugherty were paid by the mile, he apparently doubled his mileage rate on some surveys.
A survey of the interior of section 36, if previously not subdivided, would require adoption of a mean course to establish the E-W 1/4 line. That is, a mean course would be calculated between the NW and NE corner of section 36 on a straight line. (One Method: The sum of the bearings of each line times the distance of each line; divided by the total length of the lines.) The E-W 1/4 line then would be run to the west shore of Range line Lake on a mean course between that established for the N line of the section and that of the S line of the section. As an example, if the N line were found to be S 79° E and if the S line were S 86° E the E-W 1/4 line would be S 82° 30' E and a meander corner would be set on that line at the west edge of Range Line Lake. The N-S 1/4 line then would be run between the established N 1/4 and S 1/4 corners and the legal center of the section would be monumented at the intersection of the N-S, E-W 1/ 4 lines.
The Wisconsin "equidistant" rule probably now invalid.
Section 59.62, Stats., requires application of the federal rules for section subdivision. Section 59.62, Stats., became effective in its present form March 26, 1970. Ch. 499, Laws of 1969. The "equidistant" rule was adopted in Thunder Lake L. Co.v. Carpenter, 184 Wis. 580, 583, 200 N.W. 302 (1924), and affirmed in Gahan v. Lymer, 196 Wis. 313, 317-318, 220 N.W. 532
(1928).
Both of the above cases arose out of disputes in sections 27 and 28, Town 39 N, R 11 East, Oneida County, over locations of N-S, E-W 1/4 lines because some 1/4 corners and section corners fell in meandered lakes. The government surveyors, never set section or 1/4 corners in meandered lakes. Both sections contained so much lake area that almost all the land area was designated government lots on the original plat. Establishment of the N-S, E-W 1/4 lines affected the size, waterfronts or ownership of several lots in both cases. The rule enunciated in the Thunder Lake case was stated as follows at 184 Wis. 583: *Page 269 
 ". . . the west quarter corner never having been located and fixed by the government so as to become a permanent standard [because it fell in a meandered lake], the trial court properly determined that the true east-and-west quarter line should be placed equidistant between the north and south lines of the section, thus distributing the conceded deficiency in this section equitably and ratably over the entire section. . . ."
If the Thunder Lake rule were applied in section 36 herein the E-W 1/4 line would have two bearings corresponding to the N section line in order to satisfy the requirement that the E-W 1/4 line "be placed equidistant from the north and south lines of the section." By definition quarter lines are straight lines. Manual, ch. 3:87. The course of such a line must be a mean. Manual, ch. 3:88. The Thunder Lake rule conflicts with the requirements of the rules adopted by sec. 59.62, Stats., and therefore should yield.
 Resurvey of Section 36, T39N, R10E, Oneida County, if previously subdivided.
You have submitted copies of Surveyor D.H. Vaughn's notes for April, 1901, and May, 1915. Vaughn was the first person to survey the interior of section 36 herein.
On April 3, 1901, Vaughn established the E 1/4 corner on the ice at 40.43 36/100 chains from the SE section corner by single proportionate measure between the meander corners. Proportioning between meander corners is improper. Manual, 5:34, Underwood andThunder Lake cases, supra. Then he ran a line west 80 chains to establish a temporary W 1/4 corner. The original W 1/4 corner could not be found. On April 4 and 5, 1901, he found the SW and NW section corners and reestablished the W 1/4 corner equidistant between the NW and SW section corners at 14.41 chains. On April 5, 1901, Vaughn then corrected the E-W, N-S 1/4 lines and set the center section corner. He recorded the directions of the N-S, E-W 1/ 4 lines and the distances from the center 1/4 corner as follows:
 "Course of NS 1/4 line 6.33 W EW 1/4 line 2.54 W Distance to N 1/4 line 47.47 S 1/4 line 42.88 E 1/4 line 34.60 W 1/4 line 40.99" *Page 270 
On April 5, 7 and 10, 1901, Vaughn set some further corners as follows in the NE 1/4 of sec. 36:
 23.73 Chains N of Center 1/4 Corner set 1/8 post; 17.30 Chains E of Center 1/4 Corner (on ice) set 1/8 post; 14.03 Chains E of N 1/4 Corner set 1/8 post; E 31.33 Chains from N 1/8 Post on N-S 1/4 line set 1/16 post.
Meander Corners:
 Corrected E-W 1/4 line E from center 1/4 section corner to lake and set meander post 25.84 chains W of E 1/4 Post (on ice).
 N from E 1/8 post (on ice) 4.3.50 Chains to E 1/8 post on N section line then corrected back setting meander corner 11.00 chains N of E 1/8 post (on ice)
 Reset meander corner on N side of Range Line Lake on E section (town) line.
In 1915, Vaughn established more 1/8 corners in the NW 1/4 of Section 36, but the copy of his notes submitted is very difficult to read. In any event, for purposes herein, Vaughn did establish a center 1/4 corner in section 36 herein and a meander corner at the W edge of Range Line Lake on the E-W 1/4 line.
At the present time, Vaughn's center quarter corner has not been recovered. You state, however, that Vaughn's meander corner at the W edge of Range Line Lake on his E-W 1/4 line can be recovered by competent witnesses although physically it has disappeared because of erosion of the west bank of the lake Thus, Vaughn's E-W 1/4 line and the center 1/4 corner can be reestablished by running a course from the W 1/4 corner to the replaced meander corner on the W edge of Range Line Lake and where such line intersects the N-S 1/4 line, Vaughn's center 1/4 corner can be reestablished.
Is the DNR bound by Vaughn's survey'? That is, must the DNR reestablish Vaughn's improperly placed center 1/4 corner, or must DNR follow the mandate of sec. 59.62, Stats., and place the center 1/4 corner as provided in the Manual?
A center 1/4 corner is not subject to any statute like the federal statute which declares that exterior section corners as originally *Page 271 
placed are unchangeable even if incorrectly placed. Manual, ch. 1:20. If, however, property rights have accrued in reliance on Vaughn's interior lines and corners by possession, adverse possession. prescription, estoppel or otherwise the courts are reluctant to disturb such lines and corners. In Nagel v.Philipsen, 4 Wis.2d 104, 110, 90 N.W.2d 151 (1958), the court stated:
 "We deem the case of Baldwin v. Harrelson (1934), 229 Ala. 469, 470, 158 So. 416, to be directly in point on this issue. We quote from the opinion in that case as follows:
 "`It is firmly settled, in our decisions, that a survey of lands intended to locate the boundary between adjoining lands, followed by acquiescence and possession by both adjoining owners to the line thus located, is evidence of the verity of such line; and prima facie establishes same as a true line, without regard to the statute of limitations. Chambless v. Jones, 196 Ala. 175, 71 So. 987; Cooper et al. v. Slaughter, 175 Ala. 211, 57 So. 477; Oliver v. Oliver, 187 Ala. 340, 65 So. 373; Smith v. Rachus et al., 195 Ala. 8, 70 So. 261; Wragg v. Cook, 220 Ala. 111, 124 So. 228.
See also, Seybold v. Burke, 14 Wis.2d 397, 400-403,111 N.W.2d 143 (1961); Grell v. Ganser, 255 Wis. 381, 383-384, 39 N.W.2d 397
(1949); Neff v. Paddock and others, 26 Wis. 546, 550-551 (1870).
It is therefore my opinion that the DNR properly can establish the E-W 1/4 line and the center quarter corner of section 36 herein pursuant to the Manual if property rights are not disturbed. However, it is my opinion that a court probably would declare that property rights have accrued over the last 80 years in reliance on Vaughn's E-W 1/4 line and center 1/4 corner so that his E-W 1/4 line and center 1/4 corner have, in fact, b(:come the title line and corner.
CONCLUSION
The surveyor, thus, faces a mix of legal and surveying principles in determining the location of original lines and corners and title and possession lines and corners. Whether his opinion prevails as to locations of such lines and corners depends on his ability to find and evaluate evidence and convince the court of its soundness. In Rosen v. *Page 272 Ihler, 267 Wis. 220, 225, 64 N.W.2d 845 (1954), cert. denied,348 U.S. 972 (1955), the Wisconsin Supreme Court stated:
 "The testimony of the surveyors clearly indicates that there was no unanimity of opinion between them as to correct survey practice that was to be employed under conditions as here in the ascertainment of the location of the section line. Mr. Corbett looked for lost corners and used the `proportionate method.' Mr. Hall and Mr. Grimmer, while considering the notes of the government survey, allowed specially for variation between the magnetic bearing and the true bearing. Mr. Rollman agreed that the method employed by Hall and Grimmer was in conformity with recognized surveying practice. Mr. Corbett testified that instead of using magnetic variations, he ran the line from points — although the known points were not designated by markers.
 "In the absence of a showing that the method employed by Mr. Corbett was the only one recognized in surveying practice and that his was the only result possible, it was clearly within the province of the court to determine the weight and credibility of the testimony of these witnesses.
BCL:JPA