Peter H. and Barbara J. STEUCK LIVING TRUST,
Peter H. Steuck and Barbara J. Steuck,
Plaintiffs-Respondents,†

v.

Newell L. EASLEY, Defendant-Appellant.

Court of Appeals

*No. 2009AP757. Submitted on briefs December 14, 2009.
—Decided May 13, 2010.*

2010 WI App 74

(Also reported in 785 N.W.2d 631.)

† Petition for Review denied w/ $50 costs on 8/18/10.

455

460

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Stanton E. Thomas* of *Mallery & Zimmerman, S.C.*, Stevens Point.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Thomas A. Lorenson* of *Kubasta, Rathjen, Bickford & Lorenson*, Wautoma.

Before Dykman, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. This adverse possession claim concerns approximately seventeen acres of undeveloped land in a larger tract of several hundred acres primarily used for hunting by the titleholder, Newell Easley.[1] Easley appeals the circuit court's determination that the plaintiffs established title to the disputed area by adverse possession. We conclude that, properly applying the presumption in favor of the titleholder and placing the burden of proof on the plaintiffs, the hunting and related activities of the plaintiffs' predecessors do not constitute open, notorious, visible, exclusive, and hostile use of the disputed area. We also conclude that a swampy area and a man-made drainage ditch do not constitute a substantial enclosure as required by WIS. STAT. § 893.25(2)(b)1. (2007–08).[2] Finally, we conclude the plaintiffs have not established adverse possession under the doctrine of acquiescence, assuming without deciding that this is an alternative means of proving adverse possession. Accordingly we reverse and remand.

## BACKGROUND

¶ 2. Easley owns at least 360 acres of undeveloped land in the Township of Shields, Marquette County. He uses his land primarily for hunting and also for activities such as gathering firewood, picking apples, and hiking on the hiking trails. He has set aside some of his land as a sanctuary for the purpose of managing, growing and protecting a deer herd.

[1] For purposes of the trial on the adverse possession claim, the plaintiffs stipulated that Easley would be considered the titleholder of the disputed area.

[2] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

¶ 3. The property in dispute lies in the northeast corner of Lot 6, which Easley purchased in 1987. Consisting of approximately seventeen acres, the disputed area is bounded on the east by the property of the plaintiffs,[3] on the west by Mud Lake, and on the south by a swampy area and a man-made drainage ditch. The northern boundary is the line between Lot 6 and another neighbor.[4]

¶ 4. The complaint alleges that the use of the disputed area by the plaintiffs' predecessors in title for more than twenty years has established ownership by adverse possession as provided in WIS. STAT. § 893.25.[5]

---

[3] The plaintiffs are the Peter H. and Barbara Jo Steuck Living Trust, Peter H. Steuck, and Barbara Jo Steuck. For ease of reference, we refer to them collectively as the plaintiffs.

[4] As noted in footnote 1, the parties stipulated that, for purposes of the trial on adverse possession, Easley owned the disputed area. That means, as we understand it, that for purposes of this trial, the disputed area is in Lot 6. The circuit court explains in its opinion that, because of the shrinkage and drainage of Mud Lake, there may be a dispute over whether the resulting "new" land is in Lot 6 or is part of the plaintiffs' property, but that is an issue that will be tried separately, if necessary.

[5] WISCONSIN STAT. § 893.25 provides:

> Adverse possession, not founded on written instrument. (1) An action for the recovery or the possession of real estate and a defense or counterclaim based on title to real estate are barred by uninterrupted adverse possession of 20 years, except as provided by s. 893.14 and 893.29. A person who, in connection with his or her predecessors in interest, is in uninterrupted adverse possession of real estate for 20 years, except as provided by s. 893.29, may commence an action to establish title under ch. 841.

> (2) Real estate is possessed adversely under this section:

> (a) Only if the person possessing it, in connection with his or her predecessors in interest, is in actual continued occupation under claim of title, exclusive of any other right; and

¶ 5. At the trial to the court, Dale Daggett, the plaintiffs' predecessor in title, testified that when he purchased the property in 2001, he believed he owned the disputed area and he treated it as his. He bow hunted there in the fall of 2003; he went four-wheeling there three or four times in 2003 and a couple times in 2004; he took friends to walk there; and he cleared brush off a trail. He never saw anyone else in that area.

¶ 6. The owner of the plaintiffs' property before Daggett, Gordon Daniels, testified that when he bought the property in 1974, he believed it included the disputed area. He hunted that area steadily with friends from 1974 through 2003, putting up several tree stands and leaving them up year round. In 1974, in order to gain access to the lake, he and a neighbor made a road across Daniels' property and into the disputed area and then made a walking trail from there to the lake.

¶ 7. Easley testified that he and one or more of his family and friends are on his land approximately 180 days per year. They do not hunt in the sanctuary, which includes the disputed area. He goes into the disputed area once or twice a year and tries to observe it from a distance because walking through it defeats the purpose of a sanctuary. He never noticed persons trespassing in the disputed area nor saw anything that caused him to believe someone was doing something of a permanent nature. No one in his family or his hunting group gave him any indication there was hunting or other activities going on in the disputed area. He did see two tree stands in the area, but they were very old, and

(b) Only to the extent that it is actually occupied and:

1. Protected by a substantial enclosure; or

2. Usually cultivated or improved.

he was sure they had been there for many years prior to his purchase of the property.

¶ 8. The court concluded that the plaintiffs had established title by adverse possession to the disputed area and entered judgment granting full right and title to that property to the plaintiffs. The court determined that Daniels' testimony and that of the persons with whom he had hunted established that he had made open, notorious, visible, exclusive, hostile, and continuous use of the disputed area as hunting land for twenty-nine years without interference from anyone. The court found that the discharge of guns would have been audible to Easley but that not once, before 2006, did he evict any trespasser or hunter from the disputed area. The court also determined that the disputed area on the southern border was protected by a substantial enclosure: a swampy area and the man-made drainage ditch. The court found that the disputed area was "fairly impenetrable" from Lot 6 but was easily accessed from the plaintiffs' property. Finally, the court determined that Easley acquiesced in the man-made ditch as the boundary line between his property and that of the plaintiffs and their predecessors in title.

## DISCUSSION

¶ 9. On appeal Easley contends: (1) the circuit court disregarded the presumption in favor of the titleholder and improperly placed the burden on him to prove he had taken measures to keep people off his property; (2) the evidence is insufficient to establish adverse possession when the correct legal standard is applied; and (3) the evidence is insufficient to show he acquiesced to the man-made ditch as the boundary between his property in Lot 6 and the plaintiffs' property.

¶ 10. The plaintiffs respond that the circuit court correctly applied the presumption and that the evidence is sufficient to satisfy the legal standard for adverse possession and for acquiescence.

■■

¶ 11. In reviewing a circuit court's determination of adverse possession, we accept the circuit court's factual findings unless they are clearly erroneous. *Klinefelter v. Dutch,* 161 Wis. 2d 28, 33, 467 N.W.2d 192 (Ct. App. 1991). We review de novo whether those facts fulfill the legal standard for adverse possession. *Id.* Our standard of review is the same regarding the doctrine of acquiescence. *See Arnold v. Robbins,* 209 Wis. 2d 428, 432, 563 N.W.2d 178 (Ct. App. 1997).

¶ 12. Our review in this case is facilitated by the circuit court's extensive findings of fact and discussion, and we appreciate the circuit court's effort. However, our analysis of the correct application of the legal standards differs from that of the circuit court, and we therefore reach a contrary conclusion.

I. Adverse Possession under Wis. Stat. § 893.25

¶ 13. Pursuant to Wis. Stat. § 893.25(2)(a) and (b), real estate is possessed adversely only if "the person possessing it, in connection with his or her predecessors in interest, is in actual continued occupation under claim of title, exclusive of any other right," and "[o]nly to the extent that it is actually occupied." In addition, the property must be "protected by a substantial enclosure" or "usually cultivated or improved." § 893.25(2)(b). Pursuant to § 893.25(1), the adverse possession must be uninterrupted for twenty years.[6]

---

[6] There is no dispute that, if the activities of the plaintiffs' predecessors and their friends fulfill the standard for adverse possession, this twenty-year requirement is met.

¶ 14. In order to constitute adverse possession, "the use of the land must be open, notorious, visible, exclusive, hostile and continuous, such as would apprise a reasonably diligent landowner and the public that the possessor claims the land as his own." *Pierz v. Gorski,* 88 Wis. 2d 131, 137, 276 N.W.2d 352 (Ct. App. 1979) (citations omitted). "Hostile" in this context does not mean a deliberate and unfriendly animus; rather, the law presumes the element of hostile intent if the other requirements of open, notorious, continuous, and exclusive use are satisfied. *Burkhardt v. Smith,* 17 Wis. 2d 132, 139, 115 N.W.2d 540 (1962) (citations omitted). "Both . . . the fact of possession and its real adverse character" must be sufficiently open and obvious to "apprize the true owner . . . in the exercise of reasonable diligence of the fact and of an intention to usurp the possession of that which in law is his own . . . ." *Allie v. Russo,* 88 Wis. 2d 334, 343–44, 276 N.W.2d 730 (1979) (citations omitted). The size and nature of the disputed area are relevant in deciding if the use is sufficient to apprise the true owner of an adverse claim. *See Pierz,* 88 Wis. 2d at 139.

¶ 15. The party seeking to claim title by adverse possession bears the burden of proving the elements by clear and positive evidence. *Allie,* 88 Wis. 2d at 343. The evidence must be strictly construed against the claimant and all reasonable presumptions must be made in favor of the true owner. *Id.* One of these presumptions is that "actual possession is subordinate to the right of [the true] owner." *Zeisler Corp. v. Page,* 24 Wis. 2d 190, 198, 128 N.W.2d 414 (1964).

¶ 16. We first consider Easley's assertion that the circuit court ignored the presumption in favor of the

titleholder and improperly placed the burden on him. Easley points to the court's several references to Easley's failure, until 2006, to post no-trespassing signs on the eastern boundary of the disputed area to keep out people entering from the plaintiffs' property. The court contrasted Easley's failure to take "anti-trespasser actions" regarding the disputed area with his posting of the rest of his property and his concern with trespassers on the rest of his property. The court also apparently found it significant that there was no trail cut from the lower portion of Lot 6 into the disputed area.

¶ 17. The circuit court acknowledged that a title-holder need not use his or her land at all in order to retain title and that the burden was on the plaintiffs to prove adverse possession. However, we agree with Easley that certain of the court's findings and comments appear to require that Easley prove efforts to keep trespassers out, to post his land, and to patrol it. We clarify here that this is not the law. The elements of adverse possession are directed to the *claimant's* use of the land, and the claimant has the burden to prove those elements by clear and positive evidence. *See Allie*, 88 Wis. 2d at 343. If the claimant's use gives the titleholder reasonable notice that the claimant is asserting ownership and the titleholder does nothing, that failure to respond may result in losing title. However, in the absence of such use by the claimant, the titleholder is not obligated to do anything in order to retain title.[7]

---

[7] Certain of the circuit court's findings suggest that Easley's subjective intent is relevant to a claim of adverse possession. However, as the circuit court correctly recognizes elsewhere, the

¶ 18. We next examine whether the facts as found by the circuit court are sufficient to fulfill the legal standard that the use of the disputed area by Daggett and Daniels was open, notorious, visible, exclusive, hostile, and continuous. The circuit court determined that the regular use of the disputed area for hunting in the various annual hunting seasons by Daggett and Daniels and their friends, the dirt road and trail, and the deer stands should have been noticed by anyone who claimed title to the disputed area. The exclusivity of this use, in the circuit court's opinion, was demonstrated by an incident Daniels described, occurring in approximately 1998, in which he cut down a tree in the disputed area because a tree stand that did not belong to him or his friends was in the tree. The use was continuous, the court determined, because it occurred regularly according to the seasonal nature of hunting.

¶ 19. For the following reasons, we conclude the regular use of the disputed area for hunting, the deer stands, and the dirt road and trail do not constitute open, notorious, visible, exclusive and hostile use. Because of this conclusion, we do not discuss the requirement of continuous use.

¶ 20. There was no finding that Easley ever met Daniels, Daggett or their friends hunting in the disputed area. The circuit court found that Easley could have and should have heard the gun shots during spring and fall gun seasons. We do not agree that the

subjective intent of neither party is relevant to a claim of adverse possession. *Allie v. Russo*, 88 Wis. 2d 334, 347, 276 N.W.2d 730 (1979). We discuss in the next section the subjective intent of the parties in relation to the doctrine of acquiescence.

sound of gunshots gives a reasonably diligent title-holder notice of adverse possession. Even assuming that the shots come from the titleholder's property and not from someone else's property beyond, the gunshots would have been consistent with trespassers. As for the deer stands, the testimony was that they were portable deer stands, some kept in place all year. Even if visible, the deer stands, too, are consistent with trespassers. The dirt road and the trail continuing on to the lake are consistent with an easement to the lake rather than adverse possession of the seventeen acres. *See Pierz*, 88 Wis. 2d at 138 (logging road was at best consistent with an easement rather than adverse possession).

¶ 21. We also do not agree that Daniels' act of cutting down a tree on one occasion because it held someone else's deer stand showed Easley and the public that Daniels was attempting to keep others out of the disputed area. Given the nature and size of the disputed area, this is not reasonable notice of an exclusive claim by another. Notably, neither Dagget nor Daniels posted the disputed area, which *would* have been notice to Easley that someone else claimed it. The court did not consider it significant that Easley went into the disputed area, because, the court found, those instances were "isolated and sporadic," but Easley *did* go there occasionally and, as we have explained above, Easley was not obligated to do anything in order to retain his title.

¶ 22. The circuit court and the plaintiffs rely on the statement in *Burkhardt*, 17 Wis. 2d at 138, that "actual occupancy" for purposes of adverse possession is "the ordinary use of which the land is capable and such

as an owner would make of it."[8] The circuit court reasoned, and the plaintiffs argue on appeal, that the "highest and best use" of the disputed area was hunting, and the plaintiffs' predecessors used the area for hunting just as much as a true owner would or could. However, the quoted sentence from *Burkhardt* is followed by the italicized sentence:

> Actual occupancy is not limited to structural encroachment which is common but is not the only physical characteristic of possession. Actual occupancy means the ordinary use of which the land is capable and such as an owner would make of it. *Any actual visible means, which gives notice of exclusion from the property to the true owner or to the public and of the defendant's domination over it, is sufficient.*

*Id.* at 138 (emphasis added). In other words, although the use need be only the ordinary use an owner would make of it, the use must also be open, notorious, visible, exclusive, and hostile (as well as continuous).

¶ 23. Our conclusion that the evidence does not establish a use that was open, notorious, visible, exclusive, and hostile is consistent with the policy statement in *Pierz*. There the court concluded that the use of wooded lands by creating a worm bed, spraying, planting clover and trees, cutting down windfall, using a "logging road" and making a rock pile were either not sufficiently visible or were consistent with trespassing or an easement. *Pierz*, 88 Wis. 2d at 138–139. The court stated:

> The activities described were consistent with sporadic, trivial and frequently benign trespass. To allow adverse possession based upon such acts would encourage land-

---

[8] "Actual continued occupation" is the term used in WIS. STAT. § 893.25(2)(a).

owners to fence and post their wild land to prevent usurpation by their neighbors. Public policy favors open use of wild lands by the public. The law relating to adverse possession of wild lands ought not force land-owners to avoid the risk of losing their land by denying their neighbors the use and enjoyment of the forest.

*Id.* at 139.

¶ 24. The necessary implication of a determination of adverse possession based on the facts here is that a titleholder of large areas of hunting land must either fence or post his or her lands and be diligent about keeping trespassers off in order to avoid the risk of losing title. This result is inconsistent with the *Pierz* policy, and is not supported in this case by evidence that satisfies the legal standard for adverse possession with the presumption favoring the titleholder and the burden properly allocated to the plaintiffs.

¶ 25. The next issue we take up is that of the substantial enclosure requirement in WIS. STAT. § 893.25(2)(b)1.[9] Although we could conclude our discussion of adverse possession without addressing this issue, we choose to address it. Doing so will provide a more complete analysis of the adverse possession arguments of the parties and will be useful in addressing their arguments on acquiescence.

¶ 26. The purpose of the substantial enclosure requirement is to alert a reasonable person to the possibility of a border dispute. *Klinefelter*, 161 Wis. 2d at 35. "The boundaries may be artificial in part and

---

[9] The court did not determine that the disputed area was "usually cultivated or improved," *see* WIS. STAT. § 893.25 (2)(b)2., and the plaintiffs do not argue that the facts support this conclusion.

472

natural in part if the circumstances are such as to clearly indicate that the inclosure, partly artificial and partly natural, marks the boundaries of the adverse occupancy." *Illinois Steel Co. v. Bilot*, 109 Wis. 418, 441, 85 N.W. 402 (1901). In addition, the enclosure "must be of a substantial character in the sense of being appropriate and effective to reasonably fit the premises for some use to which they are adapted." *Id.* at 446. However, the enclosure need not actually prevent others from entering. *Id.*

¶ 27. Given the configuration of the disputed area and the location of the lake, the issue of a substantial enclosure in this case focuses on the southern boundary of the disputed area. As noted above, the court found that there was a substantial enclosure of the disputed property on the south, consisting of the swampy area and a man-made drainage ditch that runs approximately 200 feet from that swampy area to the eastern boundary of Lot 6. The ditch continues eastward, slightly to the north of the boundary line between the plaintiffs' property and Lot 5, owned by Easley. The circuit court found that the man-made ditch was already in existence in the mid 1950s.[10] There was no testimony on when precisely the ditch was dug or by whom, but it appears undisputed from the testimony that the purpose of the man-made ditches in this area generally was to drain water from Mud Lake to the farm or farms to the east of the plaintiffs' property. The court found that one could traverse the man-made ditch

---

[10] Although not specifically part of the circuit court's finding, it appears from the testimony that the portion of the man-made ditch in existence as of the mid-1950s included the portion that extends into Lot 6, as well as the portion running from there eastward.

473

in hunting boots or waders or by crossing on downed trees, depending on the season and the rainfall.

¶ 28. The plaintiffs appear to disagree with the circuit court's determination that the swampy area is part of the substantial enclosure, and they focus only on the 200 feet of man-made ditch in Lot 6. They assert that the man-made ditch goes to the ordinary high water mark of Mud Lake and, as we understand their argument, a substantial enclosure on the southern border of the disputed area need extend no further. Whether we consider the man-made ditch alone or together with the swampy area, we conclude that there is not a substantial enclosure on the southern border of the disputed area.

■■■■

¶ 29. With respect to the swampy area, a natural, swampy area on a titleholder's property does not provide reasonable notice that someone else is or may be claiming title to land on the other side. Therefore, the fact that the swampy area may make it harder to access the disputed area from the southern portion of Lot 6 than from the plaintiffs' property is irrelevant to the issue of a substantial enclosure. This difficulty of natural access does not contribute to providing notice to the Lot 6 titleholder that the owner of the property to the east is or may be claiming ownership of a part of Lot 6.

■■■■

¶ 30. With respect to the man-made drainage ditch running 200 feet from the swampy area to the eastern boundary of Lot 6, then continuing eastward, this ditch does not alert a reasonable titleholder of Lot 6 that someone else is or might be claiming land on the north side of the ditch in Lot 6. The ditch had already been on Lot 6 for at least three decades when Easley purchased it. There is no evidence suggesting that the

ditch was dug without the consent of the prior owners of Lot 6, and there is nothing in the nature and function of the ditch itself that would reasonably suggest it was dug by a non-titleholder claiming land on the other side.

¶ 31. The plaintiffs contend that the approximately 200 feet of man-made ditch constitutes an enclosure at least as substantial as the "mere furrow" referred to in *Illinois Steel Co.* in a passage relied on in *Klinefelter*:

> An inclosure having no purpose of physical exclusion of outside interferences—a *mere furrow* turned with a plow around the land (*Sage v. Morosick*, 69 Minn. 167) [71 N.W. 930 (1897)], or a line marked by cutting away the brush (*Worthley v. Burbanks*, 146 Ind. 534) [45 N.E. 779 (1897)], or a fence opened so as to admit outside disturbers (*Sauers v. Giddings*, 90 Mich. 50) [51 N.W. 265 (1892)]—may be sufficient under the circumstances to indicate, as a matter of fact, the boundaries of the adverse claim; and such boundaries may be evidenced satisfactorily to a jury by any means reasonably calculated to clearly suggest the same or suggest inquiry in regard thereto that would probably readily and clearly lead to a discovery of the truth.

*Klinefelter*, 161 Wis. 2d at 34–35 (quoting *Illinois Steel Co.*, 109 Wis. at 446) (emphasis added).

¶ 32. We disagree with the plaintiffs' contention. Although a "mere furrow" sounds initially most unlike a "substantial enclosure," the facts in *Sage* were that there were no fences or other enclosures of land in the vicinity and the custom was to mark the boundary lines of one's land by plowing furrows along those lines. *Sage*, 71 N.W. at 931. Thus, in the factual circumstances of *Sage*, the furrows would have been reasonably calculated to alert the titleholder of the land so marked to a

475

potential adverse claim. As we have already explained, this is not true of the man-made drainage ditch or of the swampy area.

¶ 33. We conclude the evidence does not establish that Daggett's and Daniels' use of the disputed area was open, notorious, visible, exclusive, and hostile, and also does not establish that the disputed area was protected by a substantial enclosure as required by Wis. Stat. § 893.25(2)(b)1.

## II. Acquiescence

¶ 34. The parties dispute whether the plaintiffs have established adverse possession by showing that Easley acquiesced for twenty years to the man-made ditch as the northern boundary line of his property in Lot 6. As we explain below, it is not clear whether the doctrine of acquiescence remains a distinct means of proving adverse possession when, as here, there is no issue concerning the twenty-year time period. However, whatever the precise relationship between adverse possession and the doctrine of acquiescence, we conclude the evidence does not establish acquiescence.

¶ 35. As already noted, the "hostile" requirement of adverse possession does not refer to a particular state of mind on the part of the claimant. *Burkhardt*, 17 Wis. 2d at 139. However, the law at one time did require a hostile intent—knowledge that the land was owned by another and the intent to dispossess the true owner. *Buza v. Wojtalewicz*, 48 Wis. 2d 557, 563, 180 N.W.2d 556 (1970). The result was that "one who occupied part of his neighbor's land, due to an honest mistake as to the location of his boundary" could never establish adverse possession. *Id.* Thus, courts developed the doctrine of acquiescence under which, even though a

hostile intent was absent, a party could acquire land by adverse possession if the true owner acquiesced in such possession for twenty years. *Id.* More specifically, "acquiescence by adjoining owners in the location of a fence as establishing the common boundary line of their respective properties was conclusive as to the location of such line" where the fence had stood in the same location for more than twenty years. *Nagel v. Philipsen,* 4 Wis. 2d 104, 108, 90 N.W.2d 151 (1958).

¶ 36. It would appear that, once it was established in the early twentieth century that actual hostile intent on the part of the claimant was no longer required for adverse possession,[11] the elements of adverse possession could be proved in the "fence-as-common boundary line" situation without the need for specific proof of acquiescence by the titleholder. With the focus now on the acts of possession rather than on the subjective intent of the parties, it would appear that the elements of adverse possession—actual occupancy that is open, notorious, visible, exclusive, hostile, and continuous, plus a substantial enclosure—can be established with the evidence that has sufficed under the case law to show occupancy up to a fence line for twenty years, without the need for specific proof of acquiescence by the titleholder.

¶ 37. Nonetheless, at least one "modern" case has treated the acquiescence doctrine as a distinct means of proving adverse possession *See Menzner v. Tracy,* 247 Wis. 245, 251–52, 19 N.W.2d 257 (1945). In addition, there are cases in which the doctrine of acquiescence has been used to determine the true boundary line, and,

---

[11] The court in *Burkhardt v. Smith,* 17 Wis. 2d 132, 140, 115 N.W.2d 540 (1962), explains that this has been the law since *Ovig v. Morrison,* 142 Wis. 243, 125 N.W. 449 (1910).

depending on which party prevails on that issue, the claim of adverse possession has been resolved separately. *See Grell v. Ganser*, 255 Wis. 381, 383–84, 39 N.W.2d 397 (1949) (applying the acquiescence doctrine to establish a boundary line favorable to the plaintiff, which then made it unnecessary to address the plaintiff's claim for adverse possession); and *Seybold v. Burke*, 14 Wis. 2d 397, 403–06, 111 N.W.2d 143 (1961) (after rejecting the boundary line advanced by the plaintiff under the acquiescence doctrine, addressing the plaintiff's adverse possession claim and rejecting that as well).

¶ 38. If we assume the doctrine of acquiescence remains a distinct means of proving adverse possession where there is no dispute regarding the twenty-year requirement, that assumption does not aid the plaintiffs. The cases on which the plaintiffs rely—*Grell* and *Menzner*—as well as those cited in *Nagel*, all differ significantly from the facts in this case.[12] *See also Krembs v. Pagel*, 210 Wis. 261, 246 N.W. 324 (1933). These cases all involve visible activities such as gardening, planting, farming or building up to a fence or fence line for twenty years without objection from the titleholder. The visible nature of the activity together with the commonly understood purpose of a fence to define property lines forms the basis for the reasonable inference that the titleholder's lack of objection constitutes acquiescence to that boundary line. *See Menzner*, 247 Wis. at 249–50.

---

[12] *Wiese v. Swersinske*, 265 Wis. 258, 61 N.W.2d 312 (1953); *Grell v. Ganser*, 255 Wis. 381, 39 N.W.2d 397 (1949); *Wunnicke v. Dederich*, 160 Wis. 462, 152 N.W. 139 (1915); *Brew v. Nugent*, 136 Wis. 336, 117 N.W. 813 (1908); *Wollman v. Ruehle*, 104 Wis. 603, 80 N.W. 919 (1899); *Welton v. Poynter*, 96 Wis. 346, 71 N.W. 597 (1897); and *Toby v. Secor*, 60 Wis. 310, 19 N.W. 99 (1884).

¶ 39. We have already concluded that the activity of the plaintiffs' predecessors in the disputed area was not open and visible. We have also concluded that the swampy area and man-made ditch do not provide reasonable notice to the titleholder of a potential adverse claim. Even if we assume a fence is not essential to the acquiescence doctrine, the boundary must be physically defined in some equivalent way that makes it reasonable to infer the titleholder understood it as the boundary. The swampy area and man-made ditch do not meet this standard.

¶ 40. The plaintiffs point to findings of the circuit court that, they contend, support the conclusion that Easley acquiesced to the drainage ditch being the northern boundary of his property in Lot 6. However, the court's findings on an incident in which Daniels shot a deer that ran onto Easley's property and an incident in which Easley placed a tree stand on Daniels' property do not specifically indicate that these incidents involved the portion of the drainage ditch in Lot 6. Our review of the record indicates that both incidents occurred to the east of the eastern boundary of the disputed area and concerned the boundary line between the plaintiff's property and Easley's Lot 5.

¶ 41. The same is true with most of the evidence of the no-trespassing signs south of the drainage ditch facing north. Most of the signs were described as located in Easley's Lot 5 and are therefore not relevant to the boundaries of the disputed area. The testimony on a sign or two posted in Lot 6, just to the south of the disputed area, is as follows. Daggett's friend testified that he saw a sign there in 2003 but did not know how long it had been there or who put it up. Daniels' neighbor's testimony appears to be that he saw a sign in

that area, too, but that was before Easley bought Lot 6. Easley testified that, before he bought Lot 6 he "policed" for the then-owners of Lot 6 and may have "posted the ditch" in Lot 6 for them, and he did not later take any sign down. This testimony does not meet the requirements of visible activity up to a fence or fence equivalent for twenty years, which requirements form the necessary premise for the conclusion of acquiescence. The same is true of Easley's failure to post the boundary between the disputed area and the plaintiffs' property.

¶ 42. Accordingly, we conclude the plaintiffs have not established adverse possession under the doctrine of acquiescence, assuming this doctrine remains a distinct means of establishing adverse possession.

## CONCLUSION

¶ 43. We conclude the plaintiffs have not established adverse possession of the disputed area. We therefore reverse and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded.

¶ 44. DYKMAN, P.J. (*dissenting*). I believe that the majority has made it impossible to adversely possess hunting land, which is characterized by an absence of fences and structures. Though the majority has stated that it must accept the trial court's findings, I believe that those findings require the conclusion that the plaintiffs occupied the disputed area for the required time, and that Dr. Easley did not take steps to prevent actions consistent only with ownership of the disputed area. The following findings from the trial court's opinion show this for me.

480

During all of those years, Daniels and his hunting parties, and Mr. Sheller, and Mr. Postler, among others, would have used guns during the gun deer season, and the discharge of those guns would have been readily audible to persons situated on the adjoining properties of Dr. Easley. They would have also discharged guns during the spring turkey season, as well as the fall grouse and turkey seasons. Almost all of the land owned by Dr. Easley on Exhibit 1 (in Government Lots 5, 6 and 7) would be within a half mile radius, or less, of the southern end of the disputed area. Certainly within that radius, the 19 hunters on the Easley property could have and should have heard the rifle and shotgun discharges of the plaintiff and his predecessors in interest and their invitees. Yet, not once before 2006, did Dr. Easley ever evict any trespasser or hunter from the disputed area.

. . . .

. . . While Dr. Easley and his group of 19 friends and relatives who hunted these properties demonstrated a tenacity of concern for exclusively possessing and using Dr. Easley's hunting land throughout the last half of the 1970's onward, such tenacity of concern was never demonstrated at all as to the disputed land until sometime in 2006. The contrast here is rather stunning. The very nature and extent of the anti-trespasser actions taken by Dr. Easley and his friends everywhere else on his property is in stark contrast to the total lack of any such actions on the disputed area.

. . . .

. . . When the highest and best use of the prime hunting land is for hunting, and where one party and his predecessors and invitees totally dominate that piece of land for 30 or more hunting seasons, then that is sufficient notice to everyone in the area, including the rightful owner. It is particularly true when the evidence of occupancy includes putting a road up to and

481

through part of the disputed area, as well as clearing a path from the west edge of the oak island to the eastern lakeshore of Mud Lake. Where it also includes placing numerous permanent and portable deer stands throughout the area, as well as motion-sensitive cameras as well as hunters on foot and in stands, and gunshots and arrows flying with regularity during the deer season. **I don't think it is humanly possible to occupy prime hunting space more than what the plaintiff and his predecessors have done.**

¶ 45. There is much more supporting the trial court's conclusion in its forty-three page decision. I do not take issue with the law the majority cites. But I believe that the majority has re-weighed the evidence, focused on evidence it finds more persuasive than the evidence relied on by the trial court, and therefore is able to reach a conclusion contrary to that of the trial court. I did not view the witnesses, or the hunting land. The trial court did. I am unwilling to second guess the trial court's credibility determinations and fact finding. But, because the majority has held otherwise, I can only respectfully dissent.