COURT OF APPEALS
DECISION
DATED AND FILED

July 27, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP1125**

STATE OF WISCONSIN

Cir. Ct. No.  2020CV349

IN COURT OF APPEALS
DISTRICT IV

---

BARR TRUST,

PLAINTIFF-APPELLANT,

V.

PATRICK R. RAISBACK,

DEFENDANT-RESPONDENT.

---

APPEAL from a judgment of the circuit court for Grant County: ROBERT P. VAN DE HEY, Judge.  *Reversed and cause remanded*.

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   All of the disputed real property in this case ("the disputed area") belongs to an entity called the Barr Trust, according to the deeds

held by the Trust and the owner of an adjoining parcel, Wildwood Partnership (of which Patrick Raisbeck is a partner).[1] The survey reflects the Trust's ownership of this land up to the deed-described boundary, the accuracy of which is not disputed by the parties. Wildwood nonetheless claims ownership over the disputed area by adverse possession.

¶2 Following a bench trial, the circuit court agreed with Wildwood that it is entitled to possession of the disputed area. On this ground, the court dismissed the Trust's complaint alleging trespass against Raisbeck. In the Trust's favor, however, the court granted the Trust an easement over part of a logging road where the road crosses the disputed area. In making its ruling that Wildwood is entitled to possession of the disputed area, the circuit court applied common law principles of "acquiescence," concluding that the boundary between the two properties is located where Wildwood claims it is. The Trust argues that the court erred in concluding that Wildwood gained possession of the disputed area under either of two theories: acquiescence by the Trust and its predecessors in interest to the boundary that favors Wildwood; or adverse possession of the disputed area, with emphasis on the concept of acquiescence by the Trust and its predecessors in interest.

¶3 Regarding the circuit court's determination of the boundary, we conclude that the circuit erred because it relied on evidence outside what is unambiguously described in the deeds. There was no dispute at trial that the

---

[1] The record and briefing on appeal show that the correct spelling of the defendant-respondent's last name is "Raisbeck," as reflected in the body of this opinion. Raisbeck has not requested that the caption be amended, nor has either party argued that the misspelling in the caption is relevant to any issue on appeal.

2

application of the unambiguous, shared property description in the deeds leads to the identification of the boundary at the place where the Trust argues it is.

¶4    Regarding the court's ruling in favor of Wildwood on adverse possession, we conclude that remand is necessary for a new trial to determine whether Wildwood has met its burden to show that its physical use of the disputed area was, continuously for 20 years, open and notorious, and exclusive of any other right.  Accordingly, we reverse the judgment of the circuit court and remand for a new trial regarding the physical use of the disputed area.

## BACKGROUND

¶5    In 1991, Wildwood purchased a parcel to the immediate west of a parcel owned by Barbara Barr.  Barbara's parcel would be put into the Trust in approximately December 2004.  As shown by a survey jointly obtained by the parties in preparation for trial in this case, the disputed area consists of 4.53 acres that roughly form a triangle:  two straight sides and one longer side that follows the curving path of a remnant fence.[2]  In more detail:

- The western side is a straight, north-south line described in Wildwood's deed as lying along a quarter-quarter line crossing from section 22 in the north and into section 27 to the south;[3]

---

[2] Although only Wildwood's deed appears in the trial record, the surveyor's undisputed testimony was that the survey presented at trial was based in part on his review of both parties' deeds.  The surveyor further testified that the pertinent descriptions of the boundaries in the deeds comprising the western and southern edges of the disputed area "coincided" and that there were "no overlap[s] or gaps between the descriptions themselves."  Neither party on appeal disputes that the deeds are consistent with each other in all relevant respects and that the survey accurately follows the descriptions in the deeds.

[3] All sections referenced in this opinion are located in all in Township 5 North, Range 6 West.

3

- The southern side is a straight, east-west line described in Wildwood's deed as lying along the mid-line of a quarter-quarter in section 27;

- The roughly east or northeastern side is a remnant fence line consisting of several strands of wire running through trees and stumps. By the time of the trial in this case, at least some portions of the fence had become buried. The remnant fence line has curves, but it generally follows a north-south course, with some westward progress as it progresses from its southernmost end. At its northernmost point in the disputed area, the fence runs into the western boundary noted above.

As shown in the survey, the land to the west and south of the disputed area belongs to Wildwood, while the land to the east and north belongs to the Trust. The survey further reflects that, for most of the length of the disputed area, there is a logging road (sometimes referred to as a "trail") just west of the remnant fence, which runs roughly parallel to the fence, until the road crosses through the fence line close to the northernmost point of the disputed area.

¶6     Barbara Barr, as trustee for the Barr Trust, commenced this action in October 2020, alleging that Raisbeck had trespassed onto a portion of a larger parcel belonging to the Trust that includes the disputed area and damaged it by spray-painting trees and creating a deer-baiting site. Pertinent here, Raisbeck affirmatively alleged—as a defense to the Trust's claims and as the basis for counterclaims—that by virtue of adverse possession Wildwood obtained title over the disputed area on which he had allegedly trespassed. Raisbeck sought a judgment declaring Wildwood to be the owner of the disputed area and ordering the correction of the parties' deeds.

¶7     The parties submitted pretrial reports to the circuit court. Based on these reports, the court informed the parties that the issue presented "is primarily a boundary dispute for which there is no right to a jury trial" and that claims for

4

damages would be heard after ownership of the disputed area was determined by the court at a bench trial.  Neither party objected to this approach.

¶8      The parties jointly engaged a registered land surveyor to determine the location of the boundary between their two parcels as described by the parties' deeds and also to provide a metes-and-bounds legal description for the center line of the logging road and the path of the remnant fence.  This resulted in the survey referenced above.

¶9      The circuit court conducted an on-site inspection of the disputed area.  The court observed that several landmarks and monuments reflected on the survey map were visible, including a deer stand and a "mineral site" (for baiting deer).

¶10     At trial, the parties called witnesses to testify to their understandings of who owned and used the disputed area.  Most prominently, witnesses included the surveyor, Barbara Barr, and Raisbeck.  We provide details regarding trial evidence in the discussion below.

¶11     For background purposes, it is sufficient to note the following trial evidence.  The survey identifies eight section corner or quarter-section corner markers, each with notations explaining that a landmark was found there, such as "Aluminum capped rebar and ties."  This is significant because, as discussed below, at least Wildwood's deed refers to quarter sections as reference points in describing the true boundary.  The surveyor testified that he found no existing markers in the ground on the deed-described boundary; he placed markers along the boundary himself.  Neither party at trial examined the surveyor regarding his ability to find reference points—*i.e.*, the pertinent section corner markers in the ground—needed to identify and mark the described boundary, despite the lack of

5

preexisting physical monuments or landmarks on the land marking the boundary. The surveyor also created metes-and-bounds legal descriptions of the centerline of the logging road and of the remnant fence line.

¶12    Robert Barr, the husband of Barbara, died in 2017. Raisbeck testified that Robert told Raisbeck on two occasions, in 1991 and again in 2001, that what is now the remnant fence marked the boundary between the Trust parcel and the Wildwood parcel. In contrast, Barbara testified that she had never understood the fence to be the boundary. Instead, she testified, the fence was entirely on the Trust parcel and was used to keep cattle from straying off the logging road. Barbara testified that Robert "knew better" than to think that the fence was the boundary, but acknowledged that she was not present for Robert's alleged conversations with Raisbeck about the boundary and had not separately discussed the boundary with any Wildwood representative before this litigation began.

¶13    The circuit court credited Raisbeck's testimony regarding Robert's alleged statements that the fence line marked the boundary. Further, the court determined that, in making these statements, Robert acted as an agent of the Trust with apparent authority to make these representations. Based on these determinations, the court concluded that the parties had a "mutual[] understanding" or "acquiescence" to the proposition that the boundary between the parties' properties was located along the remnant fence line.

¶14    Regarding Wildwood's adverse possession claim, the court "grant[ed Wildwood's] counterclaim for adverse possession based upon acquiescence" but also ruled that the Barrs had "established the right to an easement for use of the" logging road through the disputed area.

¶15     The Trust appeals.

## DISCUSSION

¶16     This property dispute case raises two related but distinct questions. Where is the true boundary between the Trust and Wildwood's parcels? If the disputed area is on the Trust's side of that boundary, then has Wildwood adversely possessed the disputed area? *See* ***Peter H. & Barbara J. Steuck Living Tr. v. Easley***, 2010 WI App 74, ¶37, 325 Wis. 2d 455, 785 N.W.2d 631 (noting cases in which the location of the boundary is first determined and, "depending on which party prevails," separately resolving claims of adverse possession).

¶17     Answering each of these questions requires the application of concepts of "acquiescence" as that term is used in case law. *See* ***Northrop v. Opperman***, 2011 WI 5, ¶¶31-35, 38 & n.23, 331 Wis. 2d 287, 795 N.W.2d 719 (noting the use of "acquiescence" in both the context of locating a true boundary and the context of determining an adverse possession claim). One pertinent context for the use of the term acquiescence is to ask whether, through the parties' conduct, they have mutually agreed to or accepted a line as the true boundary between parcels. *See* ***id.***, ¶¶32-38. We refer to this set of concepts as the "acquiescence-to-boundary" principles. Another pertinent context is to ask whether, through the parties' conduct, adverse possession has occurred due in part to mutual acquiescence, which can substitute for the adverse or hostile intent element of adverse possession. *See* ***id.***, ¶38 n.23; ***Chandelle Enters., LLC v. XLNT Dairy Farm, Inc.***, 2005 WI App 110, ¶8, 282 Wis. 2d 806, 699 N.W.2d 241. We refer to this concept as the "acquiescence-as-substitute" principle.

¶18     With this as background, the Trust argues that the circuit court erred when it determined that the boundary of the disputed area was established, through

"mutual acquiescence" of the parties, to be located along the remnant fence line instead of the line described by the parties' deeds. The Trust further argues that Wildwood failed to establish the elements for adverse possession. Blending what we have explained are two distinct issues, Wildwood contends that we should affirm the circuit court because it "properly considered evidence of acquiescence," referring to evidence of the parties' conduct with respect to boundary location, "to show 20 years of adverse possession."

¶19 We conclude that the circuit court erred in relying on acquiescence-to-boundary principles as a basis to establish the location of the boundary. The result of our conclusion is that the true boundary is the line described by the parties' deeds.

¶20 We further conclude that Wildwood has met its burden on some elements of adverse possession, including the establishment of "adverse intent" through acquiescence-as-substitute principles, but remand is necessary to clarify whether other elements have been met.

¶21 The following standards of review apply to both issues. *Steuck Living Tr.*, 325 Wis. 2d 455, ¶11. We uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.*; WIS. STAT. § 805.17(2) (2021-22).[4] We review de novo whether those facts fulfill the legal standards for adverse possession or acquiescence. *Steuck Living Tr.*, 325 Wis. 2d 455, ¶11.

---

[4] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## I. Boundary Location

¶22 The location of the boundary issue boils down to a dispute over whether the circuit court could properly consider evidence other than the deed-based description of the pertinent boundary, as used by the surveyor to locate the boundary on the ground, in arriving at the conclusion that the parties acquiesced to the remnant fence as the boundary. More specifically, the parties dispute whether the court could rely on evidence based on the acquiescence-to-boundary principle that could contradict the undisputed boundary identified by the deed-based survey. Most prominently, this evidence included Raisbeck's testimony that Robert told him that the fence marked the boundary. The Trust argues that the circuit court erred by applying acquiescence-to-boundary principles, resorting to this evidence even though the court determined that the deeds were unambiguous in describing the pertinent boundary. Wildwood contends that the court could properly consult non-deed evidence, such as Raisbeck's testimony, given the court's findings that the terrain is rugged and that no monuments marked the location of the deed-based boundary before the surveyor retained in this litigation placed some there. We conclude that the court had no basis to consult other evidence, because there was no dispute regarding the accuracy of the survey in identifying what the deeds unambiguously described as the boundary.[5]

---

[5] Because we conclude that the circuit court erred in relying on evidence other than the deed descriptions and the survey based on those descriptions regarding the location of the boundary, we need not address, as it relates to the first issue, the parties' arguments regarding whether that evidence can sustain the court's determinations regarding, for example, Robert Barr's agency to represent to Raisbeck that the remnant fence marked the boundary. As we explain below, however, the Trust does not develop a supported argument that the court erred on the topic of Robert's apparent authority.

*Additional Background*

¶23 Raisbeck testified at trial to the following. Wildwood purchased land adjacent to the disputed area in 1991 and has continuously owned this parcel up to the time of trial. At the time of Wildwood's purchase, the remnant fence line was visible from the logging road. After Wildwood closed on the parcel and received the deed, Raisbeck "walked all the property lines" and "determined the fences" with Robert Barr, the husband of trustee Barbara Barr. According to Raisbeck, during this review of the boundaries, Robert told him that what is now the remnant fence was the boundary between the Trust and Wildwood's parcels. Raisbeck further testified that Robert did not want to maintain the fence as a "working fence" and therefore no arrangements were made for maintaining it.

¶24 The deed received by Wildwood was introduced as an exhibit at trial. The following passage of the legal description contained in the deed describes two portions of land contained in Wildwood's purchase that define the western boundary of the disputed area:

> That portion of the following described property lying East of the centerline of [Grant County Highway A]: The South 1/2 of the Southwest 1/4 of the Southwest 1/4 of Section 22, the West 1/2 of the Northwest 1/4 of Section 27.

(Abbreviations such as "S." replaced with corresponding cardinal directions.) Essentially, the eastern edge of these two portions taken together form a straight

north-south line marking the "deed-described" boundary claimed by the Trust at trial.[6]

¶25  Barbara Barr testified that the disputed area is part of land that she personally inherited from her father in 1965, and she held sole title to the property in 1991 when Wildwood purchased the neighboring parcel. Barbara's parcel was put into the Trust in 2004. As noted, Barbara testified that she did not understand the remnant fence to be the boundary—rather, her understanding was that its only purpose was to keep cattle from wandering off the logging road.

¶26  The circuit court concluded that the legal description of the boundary in the deeds was unambiguous. The court noted that the surveyor was able to identify rebar and capped ties corresponding to the section corners that served as the points of reference for the pertinent portion of the deed description.

¶27  At the same time, however, the circuit court took the position that the roughness of the terrain and the lack of physical markers on the boundary line called for evidence beyond that reflected in the deeds. The court noted that the surveyor did not find any monuments, landmarks, or markings anywhere along the deed-described boundary of the disputed area that could be used to identify the boundary. On a related point, the court noted that, with the benefit of having personally viewed the site and heard testimony regarding the disputed area's topography, the court was aware that it is "very rough country"—essentially part of a bluff. The court concluded that these circumstances called for the court "to

---

[6] As shown on the survey map presented at trial, this boundary begins at the northeast corner of the south half of the southwest quarter of the southwest quarter of section 22 and proceeds south to the southwest corner of the north half of the northeast quarter of the northwest quarter of section 27.

consider extrinsic evidence and to use the best evidence available to determine occupation and possession." *See Northrop*, 331 Wis. 2d 287, ¶¶23, 29 & n.16, 35 (referring to evidence of boundary location outside of the deed description as "extrinsic"); *see also Chandelle*, 282 Wis. 2d 806, ¶12 (referring to evidence of a boundary location outside of and conflicting with a deed description as "'parol[] evidence'" (quoting *Elofrson v. Lindsay*, 90 Wis. 203, 205, 63 N.W. 89 (1895)).

¶28    In looking to extrinsic evidence, the circuit court credited Raisbeck's testimony regarding Robert's representations and determined that Robert had apparent authority to make them. The court did not appear to discredit any aspect of Barbara's testimony regarding historical facts, including that the fence was used in connection with managing cattle, at least for a period of time. However, the court considered this testimony about the use of the fence consistent with other evidence to the effect that the parties would later, for a long period of time, understand that the fence also served to mark the boundary. Thus, the fact that Barbara testified "unambiguously to the location of a property line" had little weight, the court concluded. The court found that her testimony was based solely on the survey and "provided no reference to anything on the ground indicating how she could have identified a boundary without the benefit of monuments."

*Analysis*

¶29    The circuit court here concluded that the facts here, as in *Northrop* itself, put this case in the category of boundary disputes "in which a survey is in conflict with a longstanding fence line" or other landmark, *i.e.*, a "survey/fence" case in which extrinsic evidence was necessary to resolve the conflict. *See Northrop*, 331 Wis. 2d 287, ¶¶29, 39, 41. The court in *Northrop* noted two varieties of acquiescence-to-boundary methodology that have been used to resolve

survey/fence cases: an "evidentiary" approach, focusing on the best evidence of a boundary's location; and a "doctrine," focusing on whether a genuine dispute over boundary location resulted in an agreement of the parties. *See id.*, ¶¶32-35 (distinguishing between "'acquiescence' in the evidentiary sense" and the "doctrine of acquiescence").

¶30    But as we explain below, this case is not a survey/fence case such that these acquiescence-to-boundary methods apply. That is, *Northrop* is distinguishable and thus its evidentiary approach does not apply here. Instead, this case involves a "definite, certain, and unambiguous" boundary in which the deeds' descriptions control the determination of where the boundary is. *See id.*, ¶29 & n.16.

¶31    In *Northrop*, the disputed boundary was defined in the pertinent deeds to follow a section line. *Northrop*, 331 Wis. 2d 287, ¶21. However, the circuit court in that case found that "the original section corner monument … no longer exists" and that there was no "competent evidence … to determine where the … monument was originally placed" nor, more broadly, was there "clear and convincing evidence [of] where the actual boundary line exists." *Id.*, ¶19. The dispute over the true boundary arose when a 2005 survey identified the boundary as being 500 feet east of the center line of a public road, even though, for the prior 88 years, the road had been "honored as the boundary line" between the pertinent sections. *Id.*, ¶¶12-15.

¶32    Our supreme court explained that these facts in *Northrop* "most closely approximate[] and [are] governed by the principles set forth in boundary dispute cases in which a survey is in conflict with a longstanding landmark," with the landmark often being a fence. *Id.*, ¶39. In these "survey/fence" cases, the

*Northrop* court explained, "a circuit court first determines whether the boundary line can be determined from the deed and original monuments or markers." *Id.*, ¶¶40, 42. "If the boundary line cannot be so determined, the circuit court looks to the best evidence of the boundary line." *Id.*, ¶42. We need not describe this analysis of "acquiescence in the evidentiary sense" laid out in *Northrop* in further detail, because as we now explain here the boundary can be determined from the deed and original monuments or markers.[7]

¶33 As the circuit court determined in this case, the pertinent deed description unambiguously describes the boundary between the parcels, which is identified in an uncontested survey that was generated based on references in the deeds to portions of various sections and section-quarters. *See id.*, ¶22 n.8 (noting that a deed description based on quarter sections may be unambiguous); *Chandelle*, 282 Wis. 2d 806, ¶16 (concluding that "description by quarter section" in that case was "sufficiently clear and definite," therefore "the doctrine of acquiescence does not apply"). It is true that there was no testimony in this case that the section-corner monuments identified in the survey were "original." At the same time, however, there was also no evidence raising a genuine dispute that they accurately marked the pertinent section or quarter-section corners, *i.e.*, that they occupied the locations marked by original monuments. *See Chandelle*, 282

---

[7] For context, we note that the court in *Northrop* described a hierarchy of evidence that circuit courts can consult. *See Northrop v. Opperman*, 2011 WI 5, ¶¶47-48, 331 Wis. 2d 287, 795 N.W.2d 719. This included, when no better evidence is available, "'long-continued occupation with respect to unchanged lines'" or "'reputation.'" *See id.*, ¶¶47-48 (quoting *City of Racine v. Emerson*, 85. Wis. 80, 88-89, 55 N.W. 177 (1893)). Applying these principles, the *Northrop* court affirmed the circuit court's ruling because, in the absence of original monuments and an unambiguous description of the boundary, the court properly relied on the historical record regarding the treatment of the road's centerline as the section line and thus the boundary. *See id.*, ¶¶53-55.

Wis. 2d 806, ¶4 & n.3, (involving the "remounting" of a section corner that was "obliterated" but not "lost"); *see also* *id.*, ¶15 (explaining that Wisconsin "authorized perpetuation of section quarters; the landmarks established under the statute presumptively mark the section and quarter section corners as originally established by the United States"). This distinguishes *Northrop*, in which it was "not possible using the deed descriptions and nothing more to locate on the ground" the section-corner-based boundary because the pertinent section corner "'cannot be located.'" *See Northrop*, 331 Wis. 2d 287, ¶22 (quoting circuit court in that case).

¶34 In short, unlike *Northrop*, the parties here did not present the circuit court with a dispute regarding the location of the true boundary. *Cf. id.*, ¶¶5, 19 (upholding as supported circuit court determination that "actual boundary line could not be determined"). Accordingly, here there is not a need, and therefore there is no legal basis, to consult extrinsic evidence regarding the boundary's location. *See Chandelle*, 282 Wis. 2d 806, ¶¶10-13 ("ambiguity in the deed" is a "prerequisite for employing extrinsic evidence"). "If parties acquiesce in 'a wrong boundary, when the true boundary can be ascertained from the deed, it is treated both in law and equity as a mistake and neither party is estopped from claiming to the true line.'" *Id.*, ¶11 (quoting *Hartung v. Witte*, 59 Wis. 285, 299, 18 N.W. 175 (1884)).

¶35 Wildwood argues that *Chandelle* and its discussion of the limited use of extrinsic evidence is distinguishable because that case dealt with a limited exception to a requirement for adverse possession. Specifically, Wildwood notes that in *Chandelle* the ultimate issue was whether the claimant's adverse possession claim could be successful despite the claimant's occupancy of the claimed land lasting fewer than the typical minimum of 20 years. *See id.*, ¶¶3-5,

9-10 (discussing exception to 20-year common law requirement for adverse possession where adjoining owners take possession of land from common grantor "'with reference to a boundary line then marked on the ground'" (quoted source omitted)). It is true that this exception is not at issue here—the parties did not take title to their respective parcels from a common grantor. For several reasons, however, we do not view the discussion of when to consult extrinsic evidence in *Chandelle* as having limited itself to this narrow conception of "acquiescence."

¶36 First, at least one precedent relied upon by this court in *Chandelle* states the applicability of acquiescence-to-boundary principles in more general terms: "where the description of the premises in a deed is definite, certain, and unambiguous, extrinsic evidence to show acquiescence in a different location is inadmissible, unless such practical location is followed by an adverse possession for such a length of time as to bar an action for the recovery of the lands." *See Elofrson v. Lindsay*, 90 Wis. 203, 63 N.W. 89 (1895); *see also Chandelle*, 282 Wis. 2d 806, ¶12; *Northrop v. Opperman*, 2010 WI App 80, ¶12, 325 Wis. 2d 445, 784 N.W.2d 736 (explaining that an "unambiguous deed" does not "trump[] mistaken boundary lines *after* the statutory period" for adverse possession (emphasis added)), *aff'd*, 331 Wis. 2d 287. Second, it is notable that our supreme court in *Northrop* does not distinguish *Chandelle* on the ground identified by Wildwood. Instead, the *Northrop* court distinguished *Chandell* due to the ambiguity in *Northrop* in the section-line-based description caused by the impossibility of locating the true section corner, as noted above. *See Northrop*, 331 Wis. 2d 287, ¶22 & n.8; *see also id.*, ¶29 & n.16 (gathering cases in which "the description of the premises in a deed is definite, certain, and unambiguous, [and] extrinsic evidence to show acquiescence [to a boundary line] in a different location is inadmissible").

¶37      Wildwood asserts that reading the principles noted in *Chandelle* as generally applicable in boundary location disputes would "vitiate acquiescence as a basis for establishing adverse possession." But this confuses the two questions presented here, each with its own usage of the concept of "acquiescence." First, the true boundary needs to be located as accurately as possible. Then, if needed, a claim of adverse possession can be addressed. Moreover, as *Northrop* and other cases demonstrate, ambiguity in deed descriptions does arise in some cases, maintaining the need in those cases for acquiescence-to-boundary analysis.

¶38      Wildwood emphasizes that the evidentiary analysis in *Northrop* begins with consideration of deed descriptions *and* original monuments, noting that here the surveyor did not find preexisting monuments in the disputed area marking the deed-described boundary. *See Northrop*, 331 Wis. 2d 287, ¶42. Wildwood apparently intends to argue that, whenever a deed description fails to reference accurate markers *within* a disputed boundary itself, the description of the boundary is necessarily ambiguous. But we see nothing in *Northrop* that dictates such a blanket result. And, to repeat, Wildwood does not point to any evidence that the section and quarter lines referenced in at least one of the deeds here was not accurately identified by the survey with reference to existing section corner monuments. Wildwood asserts that the surveyor "did not testify that he could determine from the deeds where the line should be located on the ground," but this is flatly inconsistent with the surveyor's ability to identify the boundary in the

survey and place his own monuments marking the western corners of the disputed area, the accuracy of which was not questioned at trial.[8]

¶39 In a related point, Wildwood notes that "latent ambiguities" can arise from a deed's description of a boundary when the description is applied on the ground, with reference to the particular topography, landmarks, or setting. *See Gilbert v. Geiger*, 2008 WI App 29, ¶15, 307 Wis. 2d 463, 747 N.W.2d 188 (quoting *Beduhn v. Kolar*, 56 Wis. 2d 471, 477, 202 N.W.2d 272 (1972)); *Northrop*, 331 Wis. 2d 287, ¶22 n.8 ("A description of a parcel as a quarter section in one deed may be ambiguous although a reference to a different quarter section in another deed may be unambiguous."). This can occur, for example, when a "legal description in a deed" "references natural monuments and does not fit the topography of the land" "even if [the deed-described boundary] can be accurately drawn on paper." *See Gilbert*, 307 Wis. 2d 463, ¶14. But this point does not help Wildwood, because the boundary at issue here is described in reference to rectangular subparts of sections, with the only relevant reference to a

---

[8] Wildwood argues that, in the absence of markers on the ground marking the deed-described boundary, the rough topography and only existing landmarks—the logging road and remnant fence—"contradicted" the "'logic' of the deed." But as we explain in the text, in settling where the true boundary is located, such extrinsic evidence cannot properly contradict a deed description that is unambiguous.

On a related point, to the extent that Wildwood's references to "topography" mean to rely on the circuit court's undisputed findings that the terrain of the disputed area was "very rough" and largely located on a "bluff," Wildwood merely identifies a potential basis for how a surveyor could perhaps encounter difficulty in identifying a deed-described boundary on the ground. Likewise, perhaps a dispute *could* arise regarding a survey's accuracy that is caused by the distance that a surveyor must travel from a reference point established by a monument to a disputed boundary. But, to repeat, no evidence was presented in this case tending to show that the terrain or any other factor prevented the surveyor from finding an accurate deed-described boundary.

physical landmark being the centerline of a county highway that no party argues was inconsistent with any aspect of the deed.[9]

¶40    Before leaving this issue, we turn briefly to what our supreme court in *Northrop* referred to as "the doctrine of acquiescence," which it did not apply, as distinct from principles of "'acquiescence' in the evidentiary sense," which the court upheld. *See Northrop*, 331 Wis. 2d 287, ¶¶34-35, 56.  The circuit court here did not rely on this doctrine, nor does Wildwood now on appeal.  But for completeness we note that the doctrine does not present a basis to affirm for similar reasons as those noted above.  Under the "doctrine" version of acquiescence-to-boundary, an agreement concerning the location of a boundary is binding only if it arises out of genuine uncertainty regarding the boundary's location that results in a dispute over the issue. *See id.*, ¶34 (citing *Pickett v. Nelson*, 71 Wis. 542, 546, 37 N.W. 836 (1888)); *Northern Pine Land Co. v. Bigelow*, 84 Wis. 157, 54 N.W. 496, 499 (1893) (verbal agreement recognizing the location of a boundary that was not then in dispute is not binding); *Buza v. Wojtalewicz*, 48 Wis. 2d 557, 565, 180 N.W.2d 556 (1970) ("without an original dispute prior to the erection of the fence, acquiescence short of 20 years is insufficient to render the location of the fence conclusive as to the location of the true boundary line").  There is no evidence regarding such a dispute in the record here.  Raisbeck's testimony was that Robert, as representative of the party that owned land on the boundary for longer, simply told Raisbeck that the fence was

---

[9] Wildwood notes that other boundaries described in its deed reference other extrinsic markers, including an "existing fence line" (other than the remnant fence bordering the disputed area) and a "right-of-way post."  However, these markers are reference points for boundaries not at issue at trial and Wildwood does not argue that, assuming these references do not align with conditions on the ground, they have any bearing on whether the deed-described border of the disputed area (along both its western and southern edges) is ambiguous.

19

the boundary. And to repeat again, there is no evidence of a genuine uncertainty regarding the boundary's location.

## II. Adverse Possession

¶41 Having concluded that the boundary is unambiguously described by the parties' deeds, the question remains whether the circuit court can be affirmed on the basis of adverse possession, specifically including the application of acquiescence-as-substitute principles. Aspects of the court's reasoning appear to confuse the concepts of acquiescence-to-boundary with acquiescence-as-substitution as the latter relates to adverse possession (which is understandable confusion, given the nuances of terminology in the case law, *see Northrop*, 331 Wis. 2d 287, ¶¶31, 38). But the court did conclude in Wildwood's favor that it established its claim of "adverse possession" over the disputed area "based upon acquiescence." The Trust argues that Wildwood failed to meet its burden with respect to any of the elements needed to prove a claim of adverse possession and that the court erred by failing to apply presumptions in the Trust's favor. Wildwood contends that the evidence was sufficient to affirm the court's conclusion. We conclude that remand is necessary for a new trial for the purpose of determining whether Wildwood has met its burden to show that its physical use of the disputed area was, continuously for 20 years, open and notorious, and exclusive of any other right. We cannot conclude that the evidence adduced at trial was insufficient as a matter of law to meet each of the elements of Wildwood's adverse possession claim. At the same time, however, neither can we conclude that the circuit court made implied findings of fact that support such a ruling.

¶42 Our supreme court has explained the following regarding what is required to prove a claim of adverse possession:

> Adverse possession is a legal action that enables a party to obtain valid title of another's property by operation of law. WISCONSIN STAT. § 893.25(1) bars an action for recovery or possession of real estate if it has been adversely possessed for a minimum of 20 years. Property is adversely possessed only if the possessor is in "actual continued occupation under claim of title, exclusive of any other right," § 893.25(2)(a), and the property is "protected by a substantial enclosure" or "usually cultivated and improved," § 893.25(2)(b).

> WISCONSIN STAT. § 893.25 codifies the common law elements of adverse possession, which require physical possession that is "hostile, open and notorious, exclusive and continuous...." In an adverse possession claim, the burden of proof is on the person asserting the claim. The evidence of possession must be "clear and positive and must be strictly construed against the claimant." The court must make all reasonable presumptions in favor of the true owner, including the presumption that actual possession is subordinate to the right of the true owner.

> ….

> Within the context of adverse possession, "'[h]ostility' means only [that] one in possession [of the disputed property] claims exclusive right thereto and actual possession prevents the assumption of possession in the true owner." "'Hostile intent' does not mean a deliberate, wilful, unfriendly animus. If the elements of open, notorious, continuous and exclusive possession are satisfied, the law presumes the element of hostile intent."

*Wilcox v. Estate of Hines*, 2014 WI 60, ¶¶19-20, 22, 355 Wis. 2d 1, 849 N.W.2d 280 (citations to cases omitted).

¶43 In this context, "[a]cquiescence is a supplement to the doctrine of adverse possession" "which substitutes mutual acquiescence for adverse or hostile

21

intent." *See* **Northrop**, 325 Wis. 2d 445, ¶¶8-9 (citing **Buza**, 48 Wis. 2d at 562-63).[10]

*Additional Background*

¶44    At trial, Wildwood called multiple witnesses who testified regarding their uses of the disputed area. This included Raisbeck's son and three other Wildwood partners. Each of these witnesses, along with Raisbeck, testified to using the disputed area with varying frequency for seasonal activities that mainly consisted of hunting for deer, turkey, and mushrooms, looking for shed antlers, and riding all-terrain vehicles. Of these witnesses, Raisbeck testified to being in the disputed area the most frequently—approximately 40 to 50 times a year. Multiple of these witnesses also testified that they maintained the logging road by removing from it fallen branches and trees. Raisbeck testified that he mowed the road and on one occasion used a skid loader to fill in a washed-out portion of the road. Each of these witnesses called by Wildwood stated that the witness did not see others in the disputed area or the logging road.

---

[10] In **Northrop**, our supreme court appeared to echo skepticism regarding the continued vitality of the concept of "mutual acquiescence" as a concept in the adverse possession analysis as expressed by this court in **Peter H. & Barbara J. Steuck Living Tr. v. Easley**, 2010 WI App 74, ¶34, 325 Wis. 2d 455, 785 N.W.2d 631 ("it is not clear whether the doctrine of acquiescence remains a distinct means of proving adverse possession when" there is no issue raised regarding exceptions to the 20-year requirement for adverse possession). *See* **Northrop v. Opperman**, 2011 WI 5, ¶38 n.23, 331 Wis. 2d 287, 795 N.W.2d 719. However, our supreme court stopped short of abrogating or withdrawing binding language from any case applying "acquiescence" as a supplement to the adverse possession analysis. *See id.* And here, the theory of acquiescence presented at trial was not limited to the idea that the parties' conduct demonstrated acceptance or indifference to Wildwood's use of the disputed area as a purported owner, but rather that the Trust, through Robert, had expressly conceded Wildwood's ownership up to the remnant fence. *See id.*, ¶¶32-33 (referencing "agreement" as a form of conduct that can be relevant to evidentiary or doctrinal acquiescence to a boundary location). Accordingly, we must apply the adverse possession concept of "acquiescence" in resolving this issue.

¶45 Barbara Barr testified that she was present in the disputed area about ten times a year during the pertinent time period. She described activities that included "[h]iking, viewing the scenery, sitting out on the ledge and looking down toward the river[,] … looking for wild flowers[,]" "mushroom hunting, and … a little turkey hunting …." She also testified that she and Robert would "walk the [road] and … throw the big limbs and stuff off of the road" during the pertinent time period.

¶46 Much of the circuit court's findings focused on the credibility of Raisbeck in relaying what he alleged were the representations of Robert Barr regarding the location of the boundary and Barbara Barr's credibility in expressing certainty in the boundary's location being as described in the deeds.

¶47 Regarding the substantial enclosure requirement, the circuit court stated that:

> Even if the remnant fence provided questionable evidence of an enclosure of the disputed property that would not defeat defendant's claim because the element of enclosure is to put the owner on notice of the claim, and when there is acquiescence, there is a mutual understanding on where the property line lies.

¶48 The circuit court's discussion of "mutual acquiescence" between Raisbeck and Robert Barr appears to have addressed the "hostile intent" requirement. *See **Northrop***, 325 Wis. 2d 445, ¶9; ***Steuck Living Tr.***, 325 Wis. 2d 455, ¶35. The court did not explicitly address whether Wildwood's use of the disputed area was continuous, open, notorious, or exclusive.

¶49 The circuit court further concluded the following regarding the logging road:

> The Court does not know if the theory of acquiescence covers the easement for Barr to use the logging [road] inside the disputed area. Some witnesses testified that the Barrs had permission, and others testified that [Robert] Barr said he could use it. The Court found Barr Trust should have an easement for that [road] on grounds of [Robert]'s testimony that they had the right to use it, and [Barbara]'s testimony that her family had used the [road] for decades.

Before issuing its written order, at the conclusion of trial, the court made the following related comment:

> The Barrs have in the past historically used [the logging road], and even though it is not exclusive, I think whatever they agreed to, there was also an understanding that well, the property would be determined by the fence line, the road would be something that [Wildwood and the Barrs] could both use.

*Analysis*

¶50    We begin our analysis by explaining that the express findings of the circuit court are not clearly erroneous and thus need not be revisited in a new trial. But, because these findings do not definitively address each of the elements needed to establish a claim of adverse possession, we remand the case for further fact finding.

¶51    It is true that, "[w]hen a court does not expressly make a finding that is necessary to its decision, we may assume it made that finding." *See Gittel v. Abram*, 2002 WI App 113, ¶49, 255 Wis. 2d 767, 649 N.W.2d 661. But we decline to do so in this case for the following reasons. To begin, as we explain further below, at least one set of potential implied findings in this case regarding the exclusivity of either party's use of the logging road involves inconsistent determinations by the circuit court. Further, it is not clear from the court's analysis that it intended to completely apply the requirements for an adverse

24

possession claim because at times it appeared to envision the case as exclusively involving the issue of whether the parties could mutually agree as to the location of the boundary.

¶52    We conclude that the Trust fails to show that the circuit court erred with respect to the "adverse intent" element in determining that this element was satisfied through acquiescence-as-substitute.  The Trust contends that the court erred in finding that Robert Barr represented to Raisbeck that the remnant fence marked the boundary and misapplied the law in determining that Robert had the authority to bind Barbara and the Trust with this representation.  However, the Trust does not develop a legally supported argument regarding the misapplication of hearsay rules or apparent authority principles demonstrating any error in the court's analysis on this point.  As Wildwood notes, much of the Trust's argument relies on the substance of contrary evidence that the court was free to discredit, while crediting Raisbeck's testimony.  Such arguments fail under the pertinent standard of review.

¶53    We also conclude that the circuit court did not err in determining that the remnant fence, under the facts here, constituted a "substantial enclosure." This is based in large part on:  Robert's identification of the fence as a boundary and intention not to maintain the fence as a "working fence" (through Raisbeck's testimony credited by the court); and testimony by multiple witnesses, including Barbara, that despite the fence's state of disrepair, it was a visible and known landmark originating before Wildwood purchased its land in 1991.  Under these circumstances, the fence was sufficient to mark the boundaries of an adverse possession claim. *See **Kruckenberg v. Krukar***, 2017 WI App 70, ¶12, 378 Wis. 2d 314, 903 N.W.2d 164 ("All that is required to fulfil the substantial enclosure requirement is something that indicates the boundaries of the adverse claim."

25

(citing WIS JI—CIVIL 8060 ("The requirement of 'substantial enclosure' must alert a reasonable person of a dispute over the land."))). In reply, the Trust characterizes the court as having relied on acquiescence-as-substitute to satisfy the substantial enclosure requirement, but this fails to come to grips with Wildwood's arguments, which are supported by authority that includes *Kruckenberg*. This concedes the point.

¶54 We divide our analysis of the remaining elements into two parts corresponding to different portions of land in the disputed area: we first assess the circuit court's express and implied findings with respect to the logging road, then we address the findings regarding the wooded land on either side of the road.

¶55 The circuit court reached two conclusions regarding the road: that Wildwood adversely possessed the road through acquiescence, but that the Barrs had an easement to use the road. The problem is that these conclusions necessarily imply incompatible findings. This requires remand for further consideration. To explain further, the court's determination that there had been adverse possession required the finding that Wildwood used the road exclusive of any other right. *See* WIS. STAT. § 895.25(2)(a). Turning to the court's easement ruling, we see no basis for the court to have awarded the Barrs an easement except under the theory they had obtained a prescriptive easement,[11] which requires a finding that the Barrs used the road exclusive of any other right. *See Ludke v. Egan*, 87 Wis. 2d 221, 230-31, 274 N.W.2d 641 (1979) ("A use which is

---

[11] There is no evidence in the record indicating that Wildwood conveyed an easement to the Trust. *See Rohr v. Schoemer*, 1 Wis. 2d 283, 287, 83 N.W.2d 679 (1957) (easement cannot be created by oral agreement, and reliance on oral agreement cannot create an easement where the use allowed is permissive); *see also* WIS. STAT. §§ 706.001(1), 706.02.

permissive is subservient and not adverse" and thus insufficient to meet a required element for establishing a prescriptive easement). By definition, these findings cannot coexist.

¶56 Moreover, resolving these conflicting implied findings would require the weighing of witness testimony, which is the exclusive province of the circuit court. *See Jacobson v. American Tool Cos., Inc.*, 222 Wis. 2d 384, 390, 588 N.W.2d 67 (Ct. App. 1998). As noted above, the circuit court's findings regarding witness credibility, particularly Barbara Barr's, appeared limited to the issue of where the true boundary is located and thus did not extend to the use of the property by either party or their invitees. It is true that we review de novo whether the trial evidence meets Wildwood's burden to establish the elements of its claim. Still, applying that standard of review, we are unable to conclude that Wildwood could not meet its burden without clear findings and credibility determinations regarding the use of road. For example, the circuit court on remand could, in addressing exclusivity, find that the witnesses called by Wildwood are credible regarding use of the road and also find that Barbara was credible only in testifying that use of the road was sporadic, as if permissively done. *See Kruckenberg*, 378 Wis. 2d 314, ¶8 ("'casual reentry … does not defeat the continuity or exclusivity of an adverse claimant's possession'") (quoting authority citing *Frank C. Schilling Co. v. Detry*, 203 Wis. 109, 115, 233 N.W.2d 635 (1930)); *but see Steuck Living Tr.*, 325 Wis. 2d 455, ¶¶17, 21 (titleholder of disputed land not required to do anything to retain title; the claimant bears the burden to prove each element of claim). For these reasons, we remand for a new trial instead of simply directing a determination in the Trust's favor.

¶57 Even beyond the conflicting exclusivity determinations, the circuit court will thus need to determine, based on the evidence at a new trial, whether

Wildwood established 20 years of continuous, open, notorious use that was uninterrupted at any point by "'substantial and material'" use by the true owners.

¶58 Turning to the remaining portions of the disputed area aside from the immediate areas of the road and fence (*i.e.*, essentially the wooded portions of the disputed area), the circuit court will also need to more specifically clarify the following regarding its findings of whether and how those portions of land were used in an open and notorious manner. As the Trust points out, this element cannot be satisfied by activities that are "not sufficiently visible or [that are] consistent with trespassing or an easement." *See Steuck Living Tr.*, 325 Wis. 2d 455, ¶23 (citing *Pierz v. Gorski*, 88 Wis. 2d 131, 138-39, 276 N.W.2d 352 (Ct. App. 1979)). Under *Steuck Living Trust*, visible and audible evidence of hunting activities through gunshots and even year-round deer stands are not sufficient evidence of use to put the true owner and public on notice of a claim of adverse possession because such use is consistent with benign trespass or the assertion of an easement. *See id.*, ¶¶20-22. Wildwood noted to the circuit court, as a potential basis to distinguish *Steuck Living Trust*, that Raisbeck had established a "mineral site" to bait deer since approximately 2000. Moreover, the 4.53 acres at issue here is significantly smaller than was at issue in *Steuck Living Trust*, potentially making Wildwood's activities more noticeable. *See id.*, ¶¶1, 3, 20 (deer stand, dirt road, and trail insufficient to sustain claim that involved 17 acres). But for the reasons noted above we are not certain that the circuit court intended to make implied findings on these subjects. It is not clear if the court thought that it was necessary to do so. Further, such findings could easily implicate a weighing of credibility that is not evident in the court's reasoning. And, as with the exclusivity element regarding the road, we cannot conclude that the court was unable to make credibility determinations and other findings based on the evidence that would

28

have allowed Wildwood to meet its burden regarding the element of open and notorious.

¶59 Although its position is unclear, Wildwood may intend to argue the following. It can support the open and notorious and exclusivity elements of its claim based on the circuit court's finding that Robert told Raisbeck that the remnant fence marked the boundary. This potential argument fails for at least the following reasons. First, Wildwood does not support it with legal authority establishing that an express concession of a property owner excuses an adverse possession claimant such as Wildwood from meeting the requirements codified in WIS. STAT. § 893.25 other than "hostile" or adverse intent. Wildwood fails to explain how the subjective understanding of Raisbeck, or even of the Trust, presents significant evidence in determining whether the adverse possession elements that are focused on the physical use of the disputed area have been met. *See Wilcox*, 355 Wis. 2d 1, ¶30 (characterizing "a court's inquiry" in "most adverse possession cases" as "primarily focused on the observable physical characteristics of the claimant's occupation, including whether the elements of open, notorious, continuous, and exclusive use are established"). It is true that these physical use elements are at least in part intended to establish the true owner's awareness of the occupier's claim of title, as noted above in the context of the substantial enclosure requirement. *See Kruckenberg*, 378 Wis. 2d 314; *Steuck Living Tr.*, 325 Wis. 2d 455, ¶¶19-22. Nevertheless, it remains that each of these elements is required by § 893.25, and it is unclear from the record that these elements are met based on Wildwood's physical use of the land arising from Wildwood's subjective understanding about its ownership of the land.

¶60 Second, and more generally, given our conclusion explained above that the parties here could not enter into an oral agreement regarding the location

of the boundary, Robert's representations to Raisbeck can be relevant only to the extent that they relate to Wildwood's burden to prove each element of adverse possession. To place significant weight on Robert's concession of the boundary location for purposes of each element of adverse possession would effectively undermine the case law principles we note above in our analysis of the boundary-location issue. More fundamentally, it would also circumvent the basic requirement of the statute of frauds that a conveyance of land must be accomplished through a written instrument. *See* WIS. STAT. §§ 706.001(1), 706.02; *see also* **Fehrman v. Bissell Lumber Co.**, 188 Wis. 82, 205 N.W. 905 (1925) (stating that "parol agreements" settling "dispute[s] over a boundary" did not violate the statute of frauds because "the settlement of such a dispute does not involve a grant or conveyance of land, but merely the identification of land already conveyed").

## CONCLUSION

¶61    For these reasons, the judgment of the circuit court is reversed and the cause remanded for further proceedings.

*By the Court.*—Judgment reversed and cause remanded.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

30